No. 85,503

STATE OF KANSAS, *Appellee*, v. EDWARD SCOTT BEARD, *Appellant*.

(46 P.3d 1185)

Opinion filed May 31, 2002.

*Melanie S. Morgan,* of Olathe, argued the cause and was on the brief for appellant.

*Elizabeth L. Reimer,* assistant attorney general, argued the cause, and *Carla J. Stovall,* attorney general, was with her on the brief for appellee.

The opinion of the court was delivered by

ABBOTT, J.: This is a direct appeal by the defendant, Edward Scott Beard, from his conviction of first-degree premeditated murder of Marvin Foos. Beard challenges the sufficiency of the evidence, contends the trial court erred in denying his motion to dismiss, argues the trial court erred in not admitting polygraph test results, and contends the trial court erred in instructing the jury with PIK Crim. 3d 54.07.

On the morning of May 1, 1997, Helen Foos went to her son Marvin Foos' house in LaCrosse, Kansas, and discovered Foos lying on his back on the sofa with his face drenched with blood. The bedding on the couch was soiled with blood. Foos was still alive but could not respond to Helen. Foos never regained consciousness before he died.

Helen had made plans with Foos the night before to take him and Lois Sander to the donut shop at 8:30 a.m. Helen knocked on both the screen door and the inside door. The screen door was not locked, although Helen said Foos usually locked it at night. When no one answered the door, Helen walked in and found Foos on the couch where he usually slept.

Helen testified that Sander stayed at Foos' house with him part of the time. Helen said that after she saw her son's condition, she went into shock and did not know what to do. As Helen remembered it, Sander came into the living room from the hallway and Helen asked her what was wrong with Marvin. According to Helen, Sander "just pointed to him. She wouldn't answer me." Sander was fully dressed and appeared to have been awake for awhile. Helen asked Sander if she had called 911, and Sander said no. Helen told her to call right away.

Paramedics arrived shortly thereafter. After they left, Sander asked Helen to go to the bedroom to calm down, but she refused and went into the kitchen. On the floor of the kitchen she saw two big blood splashes. Not thinking about preserving the evidence, Helen told Sander to clean up the blood and Sander did, despite telling Helen they should not do so.

Sander told a slightly different story. Sander said she was expecting Helen to come by to pick them up to go to the donut shop. Her alarm did not go off, and she jumped out of bed, got dressed, and ran into the living room. She shook Foos to wake him and told him, "Marvin you've got to get going . . . ." Sander said Foos just moved around, but did not speak. As for the blood, she said, "Well, it was brown and I thought he threw up tobacco . . . ." Foos had thrown up before when he had been drinking excessively.

Sander said she had stayed with Foos from Monday through Wednesday for approximately 2 years, cleaning his house and driving him places. Foos had cancer and part of his jaw had been surgically removed. Additionally, Sander worked for Reni Albers, a LaCrosse resident, washing walls of houses in preparation for painting. Sander met Beard while she was working for Albers. Sander also worked for someone in Beaver, Kansas, driving a tractor, so she stayed in Hoisington the other half of the week to be

closer to Beaver. Sander testified that she and Foos were friends and denied a sexual relationship with him.

It was not long after her arrival that Dottie Schuckman, E.M.T., realized that Foos' injuries were not the result of an accident. Foos was lying on his back with the left side of his head facing the ceiling. Schuckman testified that she saw several wounds on Foos' head and blood and brain matter were coming out of those wounds. She recalled there was a trash can on Foos' right side containing vomit and blood, and a coverlet was pulled up to Foos' chin. Schuckman also observed blood spatters on the ceiling and wall. After administering oxygen and beginning an intravenous line, Schuckman and another E.M.T. transported Foos to Rush County Memorial Hospital.

Shobhana Bhargava, M.D., treated Foos at the hospital, noting his semiconscious state, a wound and swelling above the left eye, and other areas of trauma on the left side of his head. Bhargava testified that the wounds appeared fresh at that time, but would not hazard a guess as to when the injuries were inflicted. Bhargava prepared Foos for transfer by life watch to Via Christi St. Francis Medical Center in Wichita so he could receive care from a neurosurgeon. Foos remained in Wichita until May 10, 1997, when he was transferred to Rush County Memorial Hospital in LaCrosse for comfort care during the end stage of his life. Bhargava declared Foos dead at approximately 2:30 p.m. on May 10.

Edward L. Jones, M.D., Rush County Coroner, performed an autopsy on Foos' body the next day. According to Jones, the punch-out nature of the wounds to the left side of Foos' head indicated he was struck with a heavy object. Because the wounds had a circular feature, Jones suggested to officers that they look for a hammer. Jones found no defensive wounds on the body, which could indicate that Foos was unaware of the attack before it happened and may have been rendered unconscious immediately after the first blow was struck. Jones listed the cause of death as traumatic blows to the head, leading to skull fractures, cerebral hemorrhage, and necrosis. Jones testified that the manner of death was homicide.

KBI Special Agents Roger Butler, Michael Van Stratton, and Alex Bachelor processed the crime scene on May 1. Butler testified that as they walked around the outside of Foos' house they found footprints near a basement window. The agents made a cast of the footprints. The interior basement window was open and the screen was in place but not latched. Inside, they saw blood in the living room area and observed drops of blood going down the stairway. At the bottom of the stairs, they saw footprints that appeared similar to the ones outside and followed the footprints back to the same basement window. Of all the basement windows, it was the only one they found opened and unlocked. A mark of mud or dirt was smeared across the basement wall under that window, appearing as if someone had rubbed his or her foot on the wall while entering or exiting the window.

The morning of May 1, Officer Joseph Sellens asked Beard when he had last seen Foos. Beard replied he last saw him around 6:30 a.m. on April 28, 1997. Sellens noted that during their conversation, Beard revealed his knowledge that something had happened to Foos. Sellens testified:

"[D]uring the conversation [he] told me that he and [Foos] didn't get along. I asked him why? And he said [Foos] was a racist. And I said what do you mean by that? And he told me that he—that [Foos] had referred to him while talking to [Sander] as a nigger. And he said, but I wouldn't do anything to him. That's just—people are what they are. And he said—and you know, just said [Foos] is a racist. He did ask me what had happened to [Foos] and I said we don't know at this time. And basically the conversation ended."

KBI agents interviewed Beard on at least six occasions during their investigation. In addition, the court authorized the attorney general's office to conduct an official inquisition.

The first interview occurred later on May 1. KBI Special Agent in Charge John Green was at the crime scene talking with Sander when he noticed a black male standing on the corner west of the residence and contacted him for an interview. Green testified that Beard told him an officer at the convenience store said Foos "had busted his head, had fallen down the stairs or something." Beard told Green that he had picked up Sander at Foos' house on the morning of April 30, 1997, for work, that they worked all day in

Liberal, and returned at 8:30 p.m. After dropping off a rototiller, Sander left. Beard went to his mother and stepfather's home for more than an hour, picked up his dog, and then went home to sleep after going to buy beer. Beard insisted he did not go to Foos' house after leaving his mother's house and said he stayed home until morning. Beard also said he had never been in the basement of Foos' house and denied ever having sex with Sander. After the interview, Green collected Beard's black tennis shoes as evidence.

The next day, May 2, 1997, KBI Special Agent Bruce Mellor interviewed Beard's stepfather, Jerry Johnson. Johnson told Mellor that before Beard left Johnson's house at approximately 9 p.m., the night before the assault on Foos, Beard told him he had to go see Sander. Johnson said that after Beard left the house, he watched him walk east toward Foos' house, which was the opposite direction from Beard's home.

On May 2, Beard agreed to a second interview with Green and Mellor. Beard said that as he walked home from his mother's house, two friends in a van stopped and drove him home. He drank two beers and went to bed. Beard told the agents he had only been to Foos' residence two times, on the mornings of April 23 and 30. Beard said he had worn his new black tennis shoes when he went to Foos' house on April 30, but said he had never been in Foos' kitchen or basement. Mellor took a pair of brown leather boots that Beard was wearing into evidence. Eventually, the agents took three pairs of Beard's shoes into custody for examination; Bolt Gears, Gauchos, and Ciaos.

LaCrosse Police Chief Leroy Penka aided the KBI agents in the search for the weapon used to assault Foos. Penka testified that because he considered Beard a suspect at that time, he assisted the agents in walking the route that Beard used to and from work. On May 5, 4 days after Foos was assaulted, Penka and Sellens located a hammer under the 8th Street bridge lying on a concrete ledge.

On May 21, 1997, a forensic scientist notified Mellor that one of the shoe impressions taken in the basement matched or was similar to Beard's Gaucho boots. Mellor asked Beard for a third interview on May 22, and Beard consented.

Once again, Beard denied ever being in Foos' basement. Beard stated that Sander told him Foos was a light sleeper and would awaken if anyone came into the house. Mellor asked Beard hypothetically, "What if your fingerprint is on the window?" Beard first responded by saying he had dropped a cigarette on the ground near that basement window because it was situated below the bedroom window where Sander slept. Then Beard implied to Mellor that the basement screen window had fallen and when he put the screen back in place he could have gotten his print on the window. Mellor then told Beard that they found his boot print in Foos' basement and asked him to explain. Mellor quoted Beard as stating, "It wasn't my blood. But again you won't find my boot in the basement." Using an interview technique designed to elicit a response, Mellor then told Beard that on one end there was first-degree murder and on the other end accidental death and said he did not believe Beard had committed first-degree murder. Mellor testified that Beard responded by stating in case they were only just talking about possibilities, there was such a thing as accessory to a crime.

Kelly Robbins, a KBI forensic scientist, examined the hammer found by police and issued a report on July 9, 1998. Robbins found blood on the claw end and neck area of the hammer. DNA tests showed the blood on the hammer was consistent with Foos' blood. Robbins also discovered a human hair on the neck of the hammer.

In October 1997, an inquisition for the purpose of investigating Foos' homicide was conducted by Assistant Attorney General Edward Van Petten. Van Petten subpoenaed Beard for an inquisition examination. Van Petten stated on the record, "I do have the authority to grant you immunity if you request it."

At the inquisition, Beard told Van Petten that Sander came by his house the night before Foos' attack, telling him that she wanted to get Foos and she wished Foos was dead. Beard said Foos was in love with Sander, but he would order her around and did not like her associating with Beard since he was African-American. According to Beard, Sander came over to his house to talk around 11 p.m., after he had visited his mother, and stayed there until 12:45 a.m. Beard said he and Sander drank beer, and he saw Sander take

enough speed that night to stay up for 2 weeks in a row. He advised Van Petten that because Sander had troubled relationships with both Foos and the man in Hoisington that she lived with, he had told Sander that she could stay at his house.

Beard brought up the subject of a lie detector test by asking Van Petten, "What do you want now? A lie detector test?" Van Petten replied, "Well, that would simplify things." After complaining about all the police attention that he and his family were receiving, the conversation with Van Petten occurred that is now the subject of dispute.

"Q. [Van Petten]: Well, like I said, you know, there's about three times today that you've just said you don't want to talk about that, and I haven't pushed you a lot, have I? I've let you pretty well dictate what you want to tell us?

"A. [Beard]: But it's the truth.

"Q. [Van Petten]: Well, I'm not arguing that, but if you're willing to sit down on a polygraph and tell us this and you pass that polygraph, then you're pretty well out of it.

"A. [Beard]: Yeah, but how do I know it's not going to be rigged up? See, that's what kills me.

"Q. [Van Petten]: Well, the KBI doesn't rig things.

"A. [Beard]: I don't know what the KBI does, believe me."

Later in their conversation, Van Petten asked Beard about his footprints in the basement. Beard claimed that since he could not lock the door to his house, someone else may have put his shoes on and went down there. After Van Petten mentioned that Beard's fingerprint had also been found inside the basement window, Beard told a different story:

"Yes, sir. Something I keep—something keeps popping into my head like I'm trying to remember one time if she asked me to come down to the basement and pulled my legs like this into that window, and I remember sliding like this and landing on the floor, but this is like—oh, I don't remember. I can't remember what day it was, 'cause see, I was drunk. But that's how, 'cause it keeps coming into my head like something, like I know I was being pulled, and that's probably how I got my fingerprints over there, probably."

Still later during the inquisition, Van Petten asked whether Beard would agree to take the polygraph test, and Beard clearly said, "I won't." Beard did agree to provide a blood sample to compare with the blood found at the crime scene.

On November 13, 1997, Van Petten, Mellor, and Assistant Attorney General Steven Starr met with Beard at the Police Department in LaCrosse to allow him to read his transcribed testimony from the inquisition and to make any necessary corrections. Mellor testified that after Beard had corrected and signed the transcript, they sat down with him and started interviewing him in general about his last statement. Mellor stated, "And at that time he said the visions he had was real. It really did happen. And he wasn't sure though what night it was." According to Mellor, Beard told them:

"He walked home that night and he was wearing the black tennis shoes. He said he never went upstairs because the floor squeaked. And he had been in Foos' house three times before. . . . And something was talked about the hammer and he said he never seen the claw hammer."

Mellor testified that Beard said Sander talked him into sneaking into the house through the basement window to have sex with her. According to Beard, Sander assisted him by pulling on his legs and shirt. Beard told them he was only in the basement for 5 seconds when he heard Foos upstairs walking around and jumped back out through the window and went home. Mellor testified that Beard told them this might have been on the night Foos was murdered.

Van Petten left the attorney general's office in January 1998. He did not participate in the subsequent investigation or in Beard's polygraph examination.

On February 5, 1998, Special Agent Green conducted a fifth interview of Beard. Green contacted Beard at the Pawnee County jail in Larned, where he had been serving a 10-day sentence, and offered to give him a ride upon his release. Beard consented to Green and Special Agent Bachelor taking him to the Harvest Inn restaurant to review his knowledge and activities associated with Foos' death.

At first, Beard said that when he left his mother's house around 9:30 p.m., two friends driving a van gave him a ride home. Sander came to his house about 10:15 p.m. According to Beard, Sander was either high or drunk and acted strangely, as if something was wrong or someone had done something to her. Beard asked her to

tell him what was wrong but she would not say. He guessed that Foos and her husband or boyfriend in Hoisington were causing her stress. Beard said as he tried to calm her down, Sander said several times that she wanted someone to hurt Foos.

At that point in the interview, Green said Beard told him he wanted to start over because he was confused and had been jumping around too much. This time, Beard said that after the two friends dropped him off at his house around 10:30 p.m., Sander came over and was not acting right. She had a small square box with her containing speed and angrily told him about Foos and her husband pulling her from different sides. Beard said that he had to hold Sander for about an hour to prevent her from going to Foos' house and harming him. After he let her go, Beard said Sander began drinking his beer. Then he reminded her that they had to work the next day, so she drove herself home. Beard said at that point he finished drinking his beer, passed out, and got up for work at 8 a.m. He said he walked to work around 8:45 a.m., but no one was at Reni Albers' shop, so he just started picking up around the shop. After he saw the ambulance turn on Foos' street around 9:10 a.m., he figured something had happened to Foos because of the way Sander had acted the night before. No one showed up at the shop, so he walked distractedly to his mother's house. From there he saw the police at Foos' residence.

At that point in the interview, Green confronted Beard because he totally omitted the information about going through the basement window with Sander's assistance. Green said Beard became visibly agitated, denied he had killed Foos, and said since Green was not his friend, he was not going to tell him everything. Beard then said he had been in the basement with Sander on a prior occasion, but not on the night of April 30, 1997. Beard made reference to Sander killing Foos and also said that if he had killed Foos he would not have used a hammer.

Green asked Beard if he would be willing to take a polygraph. Beard said he would take the test if it would get police off his case. Green testified that his response was "that if he took a polygraph and passed it that we would surely reevaluate the direction of the investigation as it pertained to him."

On February 17, 1998, Beard underwent a polygraph at the KBI office in Great Bend, Kansas. Beard later testified that he believed he had reached an agreement with the State through Van Petten that if he took and passed the polygraph test he would "be out of it." In the opinion of the KBI polygraph examiner, George Johnson, Beard's answers on relevant questions were nondeceptive, or truthful. At a pretrial hearing, however, the trial court ruled that the polygraph evidence was inadmissible at trial based on Kansas case law.

On November 6, 1998, Mellor was asked to execute a formal arrest warrant against Beard at Lansing State Penitentiary. Before handing him the arrest warrant, Mellor conducted a final interview of Beard. Once again, Beard changed his version of the events that transpired the night of Foos' murder.

Beard told Mellor that Foos did not like him and that he had heard Foos had been calling him a "nigger" behind his back. Beard also said Foos was responsible for burning a cross in his mother's lawn. On the night of the murder, Beard said he walked to Foos' house between 9:30 and 10 p.m. and knocked on Sander's bedroom window. Beard looked through the window and saw Sander sitting on her bed naked, and then she ran out of the room to help him crawl through the window. Beard said he had sex with Sander on two or three previous occasions. (At trial, Sander denied having a sexual relationship with Beard.) Beard told Mellor that Sander was still naked when he jumped inside the basement while she grabbed his calf and was pulling him inside. Then Beard heard Foos walking around upstairs so he crawled back out of the window.

When Green confronted Beard about the discrepancies in his story, he became agitated and called for the guard so he could end the interview. Mellor testified that while waiting for the guard, Beard "just voluntarily commented [that] it would be no reason to kill Foos just because he called a black a nigger. However, it would be a reason for someone to kill him if he burned a cross in his mother's yard. And he stated, but I didn't do it."

In April 1998, KBI agents interviewed Kathryn Warner, Beard's live-in girlfriend from January through April. Warner testified at trial that at the time of the April 1998 interview, she did not tell

Agent Mellor what she knew because she was afraid Beard's friends and family would come after her or her kids.

In July 1999, more than a year after the KBI's first interview with Warner, she contacted the police. According to Warner, an African-American man came to her door and told her she would have to testify on Beard's behalf, but she did not want to testify for him. Warner contacted the Rush County Sheriff's office and told the deputy sheriff she had lied in her first statement. Warner said that Beard had spoken to her about "the old man that was murdered" and stated that Beard had told her he did kill him.

Warner testified at trial that at some point during the 4 months she lived with Beard, she came up with the idea of leaving Kansas to go to Denver with Beard. She thought of leaving Kansas because Beard's response to her complaints about her husband was to suggest killing him, and she was afraid for her husband and her children. Warner stated that she and Beard did end up going to Denver and then to Las Vegas. Warner testified as to what happened on the way to Denver:

"We stopped out at a little rest area. And he wanted to get friendly. And I at that time, I mentioned something about I wanted [to] go—to go home, I missed my kids. And may I use the word? He look at me and said you stupid bitch, I should have killed you like I killed the old man.

. . . .

"He said the old man was sitting in between the dining room and the—the dining room and the kitchen like table where you eat area, which was the front room and the dining room.

. . . .

"And he told me he smacked him over the head with a hammer."

Warner explained that she thought Beard meant he used a sledge hammer, but he told her he used a claw hammer to kill Foos, placing it in his stepfather's garage afterward. Warner told police that Beard killed Foos because he owed Beard money, and because he thought that a member of Foos' family had burned a cross in Beard's mother's front lawn. Warner testified that Beard threatened to shoot her children in front of her and then shoot her if she told anyone. Beard showed Warner newspaper clippings of Foos' murder and told her he had been cleared.

The matter was tried before a jury in Rush County. Dr. Lyle Nordhoek, a forensic pathologist, testified for the defense that after examining the claw hammer and Foos' skull cap, he believed the injuries were caused by a different instrument. On cross-examination, however, Nordhoek testified that he had not been provided with the report matching the DNA of the blood found on the claw hammer to Foos and admitted that the DNA evidence indicated that the hammer found under the bridge may have been the instrument that killed Foos.

Witnesses testified at trial that Sander was initially a suspect in the murder. Counsel for the defense presented evidence that Sander believed she would receive an inheritance from Foos upon his death and that Foos had threatened to write her out of his will if she did not stop seeing Beard. Wayne Petrick testified that when he called Foos' house at 8:38 a.m. on May 1, he asked how everything was and Sander said all right. When he asked to speak to Foos, she said "no," and hung up. The defense also presented the testimony of Constance Malcolm, who lived directly across the street from Foos, who denied seeing any activity at his house from 5 to 7 a.m. In closing arguments, defense counsel contended that Sander could have killed Foos, not Beard.

The jury returned a verdict against Beard, finding him guilty of premeditated murder in the first degree. On April 26, 2000, Judge Meeks denied Beard's motion for judgment of acquittal and motion for a new trial and sentenced Beard to life imprisonment, hard 25, with 36 months of post-release supervision. Beard filed a timely notice of appeal and now challenges his conviction and sentence.

## I. SUFFICIENCY OF THE EVIDENCE

Beard contends that the State adduced insufficient evidence at trial to prove beyond a reasonable doubt that he was guilty of first-degree murder.

When the sufficiency of the evidence is challenged in a criminal case, the standard of review is whether, after review of all the evidence, viewed in the light most favorable to the prosecution, the appellate court is convinced that a rational factfinder could

have found the defendant guilty beyond a reasonable doubt. *State v. Jasper*, 269 Kan. 649, 655, 8 P.3d 708 (2000).

Beard argues that the State's primary evidence, namely his fingerprint found on a basement window frame, one possible shoeprint, a hammer found along the path Beard walked to work, and the testimony of his former girlfriend does not serve to prove beyond a reasonable doubt that he committed murder. Beard asserts that the evidence is insufficient in that it fails to connect him with Foos' murder and fails to establish premeditation.

This court has previously stated:

"Issues of credibility are within the province of the jury. On appellate review, the credibility of witnesses will not be passed upon, conflicting evidence will not be weighed, and all questions of credibility are to be resolved in favor of the State. [Citation omitted.]" *State v. McCray*, 267 Kan. 339, 343, 979 P.2d 134 (1999).

The State adduced sufficient evidence at trial to sustain Beard's conviction of first-degree murder. Foos died on May 10, 1997, as a result of blunt trauma injuries to his head inflicted on or about May 1, 1997. A hammer with Foos' blood on it was found under a bridge that Beard crossed on his way to work. Even though there was no indication of when Beard left his fingerprint on the basement window, and even though a defense expert did not believe the shoeprint found in the dust on the basement floor belonged to Beard, Beard admitted in two statements to police that he was in Foos' basement on the night of the murder. We decline to pass on Warner's credibility and find her testimony concerning Beard's confession to Foos' murder strong evidence tying him to the crime.

"Unless a person actually communicates his or her reasons for taking another's life, evidence of premeditation must be proved by circumstantial evidence. Such evidence, however, is sufficient to establish even the gravest offenses. Premeditation cannot be inferred from the use of a deadly weapon alone, but it may be inferred where other circumstances also exist. The circumstances which may give rise to an inference of premeditation include but are not limited to (1) the nature of the weapon used, (2) a lack of provocation, (3) the defendant's conduct before and after the killing, (4) threats and/or declarations made by the defendant before and after the killing, and (5) lethal blows inflicted after the deceased was felled and rendered helpless." *State v. Navarro*, 272 Kan. 573, Syl. ¶ 3, 35 P.3d 802 (2001).

Applying this test to the facts of this case, we find sufficient circumstantial evidence existed to give rise to an inference of premeditation. First, Beard concedes on appeal that the murder weapon was a hammer. Beard argues that since a hammer is a common household item and not a gun or knife preselected for the purpose of killing someone, such an instrument does not lead to the inference of premeditation.

Although in an ordinary context, a hammer is usually considered a tool, not a weapon, in many instances assailants have used hammers to perpetrate a deadly attack. See *e.g.*, *State v. Brown*, 272 Kan. 809, 37 P.3d 31 (2001); *State v. Livingston*, 272 Kan. 853, 35 P.3d. 918 (2001); *State v. Holmes*, 272 Kan. 491, 33 P.3d 856 (2001); *State v. White*, 263 Kan. 283, 294, 950 P.2d 1316 (1997); and *State v. Moncla*, 262 Kan. 58, 936 P.2d 727 (1997). Because hitting someone with a hammer will very likely result in extensive injury or death to the victim, a hammer may be considered just as deadly when used as a weapon as a pipe, baseball bat, knife, or gun. Thus, the use of the hammer as a weapon of attack may lend support to the inference of premeditation.

"[P]remeditation cannot be inferred from the use of a deadly weapon alone. Other circumstances, such as those listed above, must exist, in addition to the use of a deadly weapon, in order to support an inference of premeditation. [Citations omitted.]" *White*, 263 Kan. at 295.

Looking at the second factor, we note that there was no evidence that Foos provoked Beard into a violent reaction. Although Beard expressed a motive for killing Foos, *i.e.*, that Foos owed him money and was responsible for burning a cross on his mother's lawn, motive is not the same as provocation. Further, Dr. Jones found no defensive wounds on the body, indicating that Foos was unaware of the attack. The lack of defensive wounds would appear inconsistent with a confrontation between the men or with provocation on the part of Foos.

For the third factor, we look to Beard's conduct before and after the killing. Beard argues there was no evidence related to his conduct that would suggest premeditation. However, in Beard's statements to police he admitted sneaking into Foos' basement window

prior to the attack. Beard also gave inconsistent statements to police denying and admitting he was in the house and suggested different reasons for entering the basement window. In addition, the fact that the hammer was found under a bridge that Beard crossed daily on his way to work could give rise to the inference that Beard made an effort to conceal the murder weapon.

The fourth factor consists of threats or declarations made by Beard before and after the killing. Beard's statement to Warner that he should kill her like he did Foos provides potent evidence tying him to the murder. Beard contends, however, that his declarations do not support the idea of premeditation. We disagree. Warner testified that Beard said he killed Foos because Foos owed him money and because he thought a member of Foos' family had burned a cross in Beard's mother's front lawn. Beard's declarations lead to the inference that Beard went to Foos' house with the idea of killing Foos for a perceived wrong.

The final factor giving rise to an inference of premeditation includes lethal blows inflicted after the deceased was felled and rendered helpless. Van Petten testified that the blood spatter at the crime scene gave a good indication that Foos was in at least two different positions at the time he was struck. In addition, he stated there was enough force used in the blows dealt with the hammer to spatter blood onto a wall and the ceiling, which was approximately 6 feet above the surface of the couch. Dr. Jones found four distinct wounds on Foos' skull, two of which broke completely through the skull exposing his brain matter. Beard argues that since there was no evidence as to the order in which the blows were dealt, an inference of premeditation cannot be drawn. No evidence clearly indicates whether Foos was rendered helpless as a result of the blows from the hammer or whether Foos was asleep at the time he was attacked. Because there were no defensive wounds on Foos' body, however, it is likely that at least one of the two lethal blows was administered after Foos was felled and rendered helpless.

"A guilty verdict in a criminal case will not be disturbed on appeal if there is substantial evidence, even though the evidence is entirely circumstantial. The probative values of direct and circumstantial evidence are intrinsically similar, and

there is no logically sound reason for drawing a distinction as to the weight to be assigned to each. When a verdict is challenged for sufficiency of the evidence or as being contrary to the evidence, it is not the function of this court to weigh the evidence or pass on the credibility of the witnesses." *State v. Sanders*, 272 Kan. 445, Syl. ¶ 4, 33 P.3d 596 (2001).

Based upon the evidence presented at trial, we conclude that a rational factfinder could have found Beard guilty beyond a reasonable doubt of the premeditated first-degree murder of Foos.

## II. MOTION TO DISMISS

Beard next argues that the State breached its agreement with him to dismiss the prosecution in exchange for his passing a polygraph, and that the trial court erred by denying his motion to dismiss based on the State's breach.

"Although the question has not been raised frequently, there is authority for the view that an agreement to dismiss a pending prosecution if the defendant successfully passes a polygraph test is enforceable." 21 Am. Jur. 2d, Criminal Law § 288 (1998). Appellate courts reviewing claims of error in regard to agreements to dismiss contingent upon polygraph tests have reviewed the record for substantial evidence supporting the district court's determination. See *Harris v. State*, 841 P.2d 597 (Okla. Crim. 1992); *People v. Starks*, 146 Ill. App. 3d 843, 497 N.E.2d 187 (1986); *People v. Reagan*, 395 Mich. 306, 235 N.W.2d 581 (1975); *State v. Sanchell*, 191 Neb. 505, 216 N.W.2d 504 (1974); *Butler v. State*, 228 So. 2d 421 (Fla. Dist. App. 1969); *State v. Davis*, 188 So. 2d 24 (Fla. Dist. App. 1966).

"Substantial evidence is evidence that possesses both relevance and substance and furnishes a substantial basis of fact from which the issues can reasonably be resolved. Substantial evidence is such legal and relevant evidence as a reasonable person might accept as being sufficient to support a conclusion. [Citation omitted.]" *State v. Jacques*, 270 Kan. 173, 183-84, 14 P.3d 409 (2000).

In a pretrial motion and on appeal, Beard maintains that Van Petten cut a deal with him in regard to a polygraph examination. The State takes the position, however, that no plea agreement was reached and there was no grant of immunity actually given. There-

fore, we must first determine whether the prosecutor agreed to drop Beard as a suspect or to dismiss pending charges in exchange for Beard passing a polygraph test.

The trial court conducted a hearing on the matter on October 7, 1999. The trial court denied Beard's motion to dismiss.

According to Beard, during his inquisition examination, "the State offered to have Defendant take a polygraph test, to which Defendant asked what he would get in return. The State, speaking through Assistant Attorney General Van Petten, represented to Defendant that if he would take and pass the polygraph, then he would be eliminated as a suspect."

At the hearing, the State presented the testimony of KBI Special Agent in Charge John Green. Green had interviewed Beard at the Harvest Inn restaurant in Larned on February 5, 1998. Green asked Beard if he would be willing to take a polygraph, and Beard said he would take the test if it would get police off his case. Green testified that his response was "that if he took a polygraph and passed it that we would surely reevaluate the direction of the investigation as it pertained to him."

Ultimately, the trial court found:

"Well, I think the answer to the motion to dismiss is pretty simple if you look at it under contract law, because it is my opinion that based on the testimony that I've heard that there was no meeting of the minds.

"I think the statement made by Mr. Van Petten is subject to several interpretations, being out of the case or pretty well out of it, does not mean in my opinion that you're not going to file charges, that you're not going to continue to be a suspect. That is merely a statement made by an investigative officer saying that if you take a polygraph and pass it you'll pretty well be out of it. He didn't say you are not going to have charges filed against you. It may indicate that you would be less of a suspect, but to me it is not a clear understanding statement that could clearly be understood by either party.

"I might be a little more impressed with the situation if charges had been filed and there might have been some purported agreement between the prosecutor and the Defendant, but that hadn't happened. We're at the investigatory stage of the situation. Mr. Van Petten was very clear in his testimony that he may have statutorily had the right to offer immunity, but their internal policy prevented him from doing that. I think it is really clear that the motion to dismiss should be denied."

Here, Van Petten's initial statement to Beard in the October 1997 inquisition examination was that "if you're willing to sit down on a polygraph and tell us this and you pass that polygraph, then you're pretty well out of it." During the inquisition, Beard refused Van Petten's offer. No agreement was signed. In January 1998, Van Petten left the attorney general's office. This interchange cannot be construed as a promise by the State to eliminate Beard as a suspect or as an agreement not to file charges.

Green testified that during the February 1998 interview, he told Beard that if he passed a polygraph test, police would "reevaluate the direction of the investigation." Although his statement was designed to persuade Beard to take a polygraph, it did not contain a promise to eliminate Beard as a suspect.

Beard cites *State v. Wills*, 244 Kan. 62, 67-69, 765 P.2d 1114 (1988), in support of the idea that to the extent that any ambiguity exists in a plea bargain, this court must strictly construe the agreement in favor of the defendant. Beard's argument misses the mark. An agreement must first exist before it can be construed.

We find substantial evidence in the record sufficient to support the district court's conclusion that there was no clear understanding or agreement between the parties. Therefore, the trial court correctly denied Beard's motion to dismiss based on his claim that the State breached its agreement with him. Further, polygraph evidence has long been inadmissible in Kansas absent a stipulation of the parties. *State v. Shively*, 268 Kan. 573, 579, 999 P.2d 952 (2000). There was no stipulation made by the parties. Thus, Beard's claim of error fails.

### III. EVIDENCE THAT BEARD PASSED A POLYGRAPH TEST

Beard claims that the trial court's decision to refuse to admit evidence that he passed the polygraph denied him the ability to adequately present a defense.

"The admission or exclusion of evidence lies within the sound discretion of the trial court. An appellate court's standard of review regarding a trial court's admission of evidence, subject to exclusionary rules, is abuse of discretion. Judicial

discretion is abused only when no reasonable person would take the view adopted by the trial court." *State v. Leitner*, 272 Kan. 398, Syl. ¶ 1, 34 P.3d 42 (2001).

Beard concedes on appeal that the exclusion of evidence is subject to K.S.A. 60-261, the harmless error rule.

"No error in either the admission or the exclusion of evidence and no error or defect in any ruling or order or in anything done or omitted by the court or by any of the parties is ground for granting a new trial or for setting aside a verdict . . . unless refusal to take such action appears to the court inconsistent with substantial justice." K.S.A. 60-261

Before the trial, counsel for Beard indicated to the State that he intended to offer Sander's and Beard's polygraph test results, and in response, the State filed a motion in limine. The trial court found that since there was no stipulation between the parties, it could not admit the polygraph results, based on Kansas case law, and granted the State's motion in limine.

"When a motion in limine has been granted, it is the responsibility of the party being limited to proffer sufficient evidence to the trial court in order to preserve the issue for appeal." *Brunett v. Albrecht*, 248 Kan. 634, 640, 810 P.2d 276 (1991). See *State v. Caldwell*, 21 Kan. App. 2d 466, 473, 901 P.2d 35, *rev. denied* 258 Kan. 860 (1995).

Because Beard did not move to reconsider or make a proffer during trial, he has failed to preserve the issue of the propriety of the motion in limine for appeal. The issue is not properly before this court and will not be addressed.

## IV. PIK CRIM. 3d 54.07

Last, Beard claims that the trial court committed prejudicial error when it instructed the jury using PIK Crim. 3d 54.07, because the evidence at trial failed to show that Beard committed the offense with someone else.

"When reviewing challenges to jury instructions, we are required to consider all the instructions together, read as a whole, and not to isolate any one instruction. If the instructions properly and fairly state the law as applied to the facts of the case, and a jury could not reasonably have been misled by them, the instructions do not constitute reversible error even if they are in some way erroneous. [Citation omitted.]" *State v. Mitchell*, 269 Kan. 349, 355, 7 P.3d 1135 (2000).

"No party may assign as error the giving or failure to give an instruction unless he or she objects thereto before the jury retires to consider its verdict, stating distinctly the matter to which he or she objects and the grounds of his or her objection, unless the instruction or the failure to give the instructions is clearly erroneous. K.S.A. 22-3414(3). Instructions are clearly erroneous only if the reviewing court is firmly convinced that there is a real possibility the jury would have rendered a different verdict if the trial error had not occurred. [Citation omitted.]" *State v. Evans*, 270 Kan. 585, 588, 17 P.3d 340 (2001).

Counsel for Beard objected to the use of PIK Crim. 3d 54.07 at trial, but the trial court overruled the objection. Noting the arguments of counsel, the trial court stated:

"Okay. Well, it is my opinion based on the evidence that I've heard, that the jury may conclude that there was another party involved, particularly the evidence involving the will and inheritance possibly by Lois Sander, the evidence that was presented concerning their activities at the funeral, the observations of the lady who lived across the street, and not seeing activity during those hours that she was able to observe, that appears to me to be an appropriate instruction for this case. So, I will allow it."

The trial court used PIK Crim. 3d 54.07 as a basis for Instruction No. 6, which read as follows: "It is not a defense that another who participated in the commission of the wrongful act constituting the crime has not been charged with or convicted of the crime or any lesser degree."

In addition, the trial court instructed the jury to presume that Beard was not guilty and that if jurors had a reasonable doubt as to the truth of any of the claims required to be proved by the State to find Beard not guilty.

Beard argues that Instruction No. 6 should not have been given to the jury because the defense theory was that Sander committed the offense alone, not him, and the instruction misled the jury into thinking that they committed the offense together.

Evidence was adduced that the night before the murder Sander stated she wanted Foos dead, that Sander thought she would receive an inheritance upon his death, and that Sander may have let Beard into Foos' home. Beard's statement to investigators that there was "such a thing as accessory to a crime" standing on its own provides sufficient reason for giving this particular PIK instruction.

We find it unreasonable that the jury was misled by the jury instructions. There is no real possibility the jury would have rendered a different verdict if Instruction No. 6 had not been given. Therefore, under the facts of this case, the instructions do not constitute reversible error.

Affirmed.