No. 90,674

STATE OF KANSAS, *Appellee*, v. ROBERT J. ENGELHARDT, *Appellant.*

(119 P.3d 1148)

114

Opinion filed September 16, 2005.

*Michael P. Whalen,* Law Office of Michael P. Whalen, of Wichita, argued the cause, and *Mary Curtis,* assistant appellate defender, was with him on the briefs for appellant.

*Kristafer R. Ailslieger,* assistant attorney general, argued the cause, and *Phill Kline,* attorney general, was with him on the briefs for appellee.

The opinion of the court was delivered by

BEIER, J.: Defendant Robert J. Engelhardt appeals his conviction for first-degree premeditated murder and his hard 50 sentence, raising several issues on appeal. This court has jurisdiction under K.S.A. 22-3601(b)(1) (conviction of an off-grid crime).

### Factual Background

Engelhardt was on parole but had not reported to his parole officer as directed. He lived in Wichita with his girlfriend, Michelle

Drake, and his friends, Brian and Dorothy Smith. One ·evening Drake tried to telephone her mother, but Engelhardt became concerned that she was going to call the police and turn him in. Both couples began screaming. Drake described Engelhardt as "irate." Eventually they all left the house in Brian's car, with Engelhardt driving. At some point, Engelhardt stopped the car by the side of the road, and he and Brian got out to talk at the back of the car, discussing whether to kill the two women.

The group traveled to the trailer home of Engelhardt's cousin, Kevin Eveland, and Kevin's wife, Christina, in Newton, Kansas. Christina awoke to yelling outside the trailer. When she tried to wake Kevin, Engelhardt came in and told her and Kevin to get up and go into the living room. Michael Smith, an acquaintance of Kevin's, had come over to stay for a couple of days and was lying on the couch in the living room. Apparently, Kevin told Engelhardt that Michael had been in prison before. Michael awoke when Engelhardt and Brian started yelling at him, leaning over him, and asking him questions. Engelhardt, in a loud and threatening tone, asked Michael who he was, why he was there, if he had ever "done jail time," and if he was a "narc" who had been planted there by the cops. Michael was unable to answer the questions to the satisfaction of Engelhardt and Brian, who were both drunk and "out of control." At one point, Engelhardt made Michael lift up his shirt and pull down his pants so that Engelhardt could look for a recording device.

Engelhardt then went to the kitchen, came back into the living room, and demanded that Dorothy, Drake, Christina, and Kevin go to the trailer's back bedroom. The four of them did so, and Engelhardt and Brian stayed in the living room with Michael.

More yelling then emanated from the living room. Christina, who was pregnant, lay down on the bed in the back bedroom and held her hands over her ears. Kevin and Drake also had their hands over Christina's ears, and Kevin placed a pillow over her head because of Michael's screaming. Michael, sounding terrified, repeatedly said, "No." When asked later why she did not call the police, Christina testified that Engelhardt had directed them to unplug

the phone when he first arrived. Engelhardt had said that "they were fighting," and he did not want the police to be called.

James Striplin also lived in the trailer. He was asleep in another bedroom and woke up when Engelhardt and the others arrived. From his room, Striplin heard arguing, crying, and yelling. He later testified that he heard a discussion with Michael about prison and a cemetery around a prison. He also heard Michael say, "No, no, no." Striplin stayed in his room because he thought Michael was being smacked around and "it wasn't [his] place" to get involved. When the screaming stopped it "just went quiet," and Striplin fell asleep.

During the attack on Michael and its immediate aftermath, Drake emerged from the back bedroom three times. The first time she walked down the hall toward the living room, looked in, and walked back to the bedroom. At that time, Engelhardt and Brian were hovering over Michael, and Michael was screaming; both Engelhardt and Brian were attacking Michael, but she could not see much because of the angle of the couch. When Drake came out a second time, Engelhardt took her back to the bedroom and told her to stay there. The third time Drake left the bedroom, the screaming had stopped. She walked out to the kitchen and saw Engelhardt and Brian standing there, both covered with blood. Engelhardt held a large bloody butcher knife in his hand. Drake walked over to Michael and found him dead; there was blood everywhere, and Michael was, using her word, "demolished." The entire event lasted 20 or 30 minutes.

Drake helped Engelhardt and Brian put Michael's body on a shower curtain and into the back seat of Michael's car. Engelhardt drove Michael's car into the country, and Drake and Brian followed in Brian's car. Engelhardt and Brian dropped Michael's body into a ditch. The two men then drove Michael's car (and Drake followed) to another location and left it. They returned with Drake to the trailer.

Christina later testified that, after the trailer got quiet, Engelhardt had come back to the bedroom and told her, Kevin, and Dorothy in a threatening tone to stay there until he returned. Engelhardt had blood on his clothes and his hands. Drake then left

with him. When they returned, according to Christina, Engelhardt was covered "from head to toe" with blood. Engelhardt said Michael was there to "narc," so he "took care of the problem." Dorothy testified that Engelhardt said he had killed Michael.

Engelhardt told the others to clean up the trailer. In the living room there was blood on the walls, on the ceiling, in two puddles on the floor by the couch, and all over the couch. They dismantled the couch, tore out the carpet, and put everything that had blood on it into the back of Kevin's truck. Engelhardt and Striplin took the items in the truck and burned them.

Kevin went with Engelhardt to Wichita to get paint and carpet from the home of Paul Dickerson, Drake's former boyfriend. Kevin overheard Engelhardt tell Dickerson, "We just killed somebody." Dickerson later testified that Engelhardt said, "I killed somebody." Back at the trailer, Engelhardt told the others to tell police that the couch was gone because Striplin had fallen asleep on it with a cigarette and the couch had "burned up."

Michael's decomposing body was found 6 days after he was killed. He had been stabbed approximately 55 times in the head and chest. Michael's car also was found nearby, its keys still in the ignition. When evidence led police to the trailer, Kevin initially told them that Michael had left to get some food and never returned. When asked about the missing couch, Kevin and Christina said Striplin had fallen asleep with a burning cigarette and set the couch on fire, as Engelhardt had instructed them. However, after arson investigators started examining the scene, Kevin approached one of the detectives and said, "They killed a man on my couch, they stabbed him and we've been forced to help."

In Drake's original statements to police, she placed the blame for the killing on Brian. This was the story she, Engelhardt, Dorothy, and Brian had discussed and agreed upon. Engelhardt had told Drake she would go to jail for 40 years because she was an accessory; after the State granted her immunity, she agreed to testify against Engelhardt. According to Drake's testimony, Engelhardt told her he sliced Michael's throat and stabbed him in the heart to "put him out of his misery."

Brian testified against Engelhardt pursuant to a plea agreement in which Brian agreed to plead guilty to second-degree unintentional murder. Brian told police that he and Engelhardt had come up with a plan for Brian to take most of the blame for the killing; if witnesses became a problem, Engelhardt was to kill them. Brian said he had agreed to the plan to protect Dorothy and admitted to police that he "just goes off on people" when drunk. Brian further admitted that he and Engelhardt had been drinking on the night of the murder and said that they tended to "feed" off each other during altercations.

Brian had three different interviews with police. In all three he admitted that he was the first to stab Michael. And initially, as planned, he took the blame for the murder. By the time of the second interview, Brian said everything in his first statement was true except that he had left out that Engelhardt helped him " 'do this dude.' " At some point, Brian also told police that Engelhardt was trying to lay the whole blame on him and that Brian did not understand why.

According to Brian, Engelhardt told Michael to answer his questions or Brian would kill him. During one police interview, Brian admitted to being the first to take a paring knife from a kitchen drawer. Then Engelhardt got a second paring knife and a butcher knife from the kitchen. In another version of Brian's story, Brian obtained the butcher knife from the kitchen. As Brian was stabbing Michael, Engelhardt told Brian to "cut him deeper." In yet another version of Brian's story, Brian said Engelhardt tried to pull him off of Michael and make him stop. Brian also said that, after he and Engelhardt had inflicted multiple wounds but Michael was still talking, Engelhardt said, "We have to kill him, we'll go to jail for what we've done." Brian said that was when Engelhardt cut Michael's throat and stabbed him in the chest.

Police discovered blood on Striplin's socks and shoes, and he eventually led police to the location where he and Engelhardt had burned the bloody items from the house. Officers also found seven knives at the burn site, including paring knives and a larger knife. They found another knife in a bag of trash near the trailer.

The State charged Engelhardt with first-degree premeditated murder, three counts of kidnapping, three counts of criminal threat, one count of battery, and one count of aiding a felon. The jury found him guilty of first-degree murder and aiding a felon; however, the district judge dismissed the conviction for aiding a felon as multiplicitous. The judge then sentenced Engelhardt to the hard 50 life sentence.

### *Jury View of Crime Scene*

Engelhardt first contends the district judge committed reversible error by allowing the jury to view the interior of the trailer crime scene outside the defendant's presence.

Kansas cases have held that a district judge's decision whether to permit a jury to view a crime scene is discretionary. *State v. Morton*, 217 Kan. 642, 644, 538 P.2d 675 (1975); *State v. Winston*, 214 Kan. 525, 530, 520 P.2d 1204 (1974). And we have refused to reverse such a decision unless it qualifies as an abuse of discretion that appears to have affected the substantial rights of the objecting party. *State v. Hickles*, 261 Kan. 74, 88, 929 P.2d 141 (1996).

This is the correct analysis under the Kansas statute that addresses jury views most directly, K.S.A. 22-3418, which states:

"Whenever in the opinion of the court it is proper for the jurors to have a view of the place in which any material fact occurred, it may order them to be conducted in a body under the charge of an officer to the place, which shall be shown to them by some person appointed by the court for that purpose. They *may be* accompanied by the defendant, his counsel and the prosecuting attorney. While the jurors are thus absent, no person other than the officer and the person appointed to show them the place shall speak to them on any subject connected with the trial. The officer or person appointed to show them the place shall speak to the jurors only to the extent necessary to conduct them to and identify the place or thing in question." (Emphasis added.)

In this case, the State invoked this statute in its motion to permit members of the jury to walk through the trailer where the murder took place, asserting the jury view would assist the jury in understanding the amount of space in the trailer and its layout. Defense counsel objected, arguing the jury view would be a "critical stage" in the proceedings against Engelhardt, that the jury would be see-

ing evidence, and that Engelhardt therefore had a right to be inside the trailer during the jury view.

The district judge offered Engelhardt the opportunity to be present outside the trailer but ruled he would not be allowed inside the trailer because of its close quarters. Defense counsel rejected the judge's suggestion that Engelhardt could wait in a car across the street from the trailer so the jury would not see him in shackles. Defense counsel also rejected the prosecutor's suggestion that Engelhardt be permitted to stand outside the trailer with the judge and counsel for both sides.

Ultimately only the jurors were taken to the scene by the bailiff. They had previously been directed by the district judge to enter the trailer two at a time, walk to one end and back, and then get back on the county bus that had transported them. The judge had further admonished the jurors not to talk among themselves or touch anything in the trailer.

K.S.A. 22-3418 provides no absolute right for a criminal defendant to be present at a jury view of a crime scene. On the contrary, the statutory language is plainly permissive; jurors "may be" accompanied by the defendant on such a jury view, but the defendant's presence is not required. Given the space limitations of the trailer crime scene here, the district judge's admonition to jurors not to talk during the view, and Engelhardt's rejection of two reasonable suggestions that would have allowed him to be present just outside the trailer while jurors walked through it, we see no abuse of discretion under K.S.A. 22-3418.

This claim requires further analysis, however. Engelhardt also appears to argue that his absence from the jury view in this case denied him his state statutory right as well as his federal constitutional rights under the Confrontation and Due Process Clauses of the United States Constitution to be present at all critical stages of his trial. Claims that require us to engage in interpretation of statutes and constitutional analysis raise legal questions subject to unlimited review on appeal. See *State v. Maass*, 275 Kan. 328, 330 64 P.3d 382 (2003) (interpretation of statutes); *State v. Rivera* 277 Kan. 109, 113, 83 P.3d 169 (2004) (constitutional evaluation).

K.S.A. 2004 Supp. 22-3405 states that a defendant in a felony case "shall be present . . . at every stage of the trial . . . except as otherwise provided by law." This statute has been interpreted to mean that the defendant must be present at any stage of the trial when the jury is in the courtroom or when the defendant's presence is " 'essential to a fair and just determination of a substantial issue.' " *State v. Lopez*, 271 Kan. 119, 130, 22 P.3d 1040 (2001); *State v. Edwards*, 264 Kan. 177, 197, 955 P.2d 1276 (1998); *State v. Turbeville*, 235 Kan. 993, 1002, 686 P.2d 138 (1984); *State v. Rhoads*, 20 Kan. App. 2d 790, 794, 892 P.2d 918 (1995).

In addition, the Confrontation Clause of the Sixth Amendment and the Due Process Clause of the Fourteenth Amendment require a defendant's presence at every critical stage of the criminal proceedings against him or her. *Lopez*, 271 Kan. at 129-30; see *Illinois v. Allen*, 397 U.S. 337, 338, 25 L. Ed. 2d 353, 90 S. Ct. 1057, *reh. denied* 398 U.S. 915 (1970); *State v. Mann*, 274 Kan. 670, 680, 56 P.3d 212 (2002).

We have previously determined that the statutory command of K.S.A. 2004 Supp. 22-3405(1) is analytically and functionally identical to the requirements under the Confrontation Clause and the Due Process Clause of the federal Constitution that a criminal defendant be present at any critical stage of the proceedings against him or her. See *Edwards*, 264 Kan. at 197 (holding defendant "has the constitutional right to be present at all critical stages of the trial" as codified in Kansas by K.S.A. 22-3405(1) and that "[i]n determining whether a proceeding is a critical stage, this court must examine whether the defendant's presence is essential to a fair and just determination of a substantial issue").

With regard to whether jury views should be regarded as a critical stage in criminal proceedings, *State v. Stratton*, 103 Kan. 226, 173 Pac. 300 (1918), provides guidance on this court's early 20th-century approach. In that case, this court upheld a jury's view of a crime scene when jurors were accompanied only by a court officer. The court rejected the defendant's constitutional claim in part because it determined he had waived his right to confrontation. In addition, however, the court cited Dean John Henry Wigmore for the proposition that a defendant's rights are not violated by a jury's

inspection of a crime scene in his or her absence, because no witnesses are examined. *Stratton*, 103 Kan. at 227 (citing 3 Wigmore on Evidence § 1803 [see Chadbourn rev. 1976]).

Other Kansas cases have consistently upheld jury views outside the presence of defendants. See, *e.g., Hickles*, 261 Kan. at 88-89 (no prejudice); *State v. Laubach*, 220 Kan. 679, 681, 556 P.2d 405 (1976) (no error in district court's order for jury to view crime scene without first consulting defense, prosecution); *State v. McCorgary*, 218 Kan. 358, 363-64, 543 P.2d 952 (1975), *cert. denied* 429 U.S. 867 (1976) (no refusal absent showing of abuse of discretion affirmatively appearing to have affected defendant's substantial rights); *State v. Zakoura*, 145 Kan. 804, 812-13, 68 P.2d 11 (1937) (jury's view of crime scene in accordance with statutory procedure, approved practice; no error when defendant did not accompany jury); *State v. Harris*, 103 Kan. 347, 352-53, 175 Pac. 153 (1918) (unauthorized viewing does not "vitiate the verdict" unless inspection prejudiced defendant); *State v. Adams*, 20 Kan. 311, 323-26 (1878) (defendant waived right to confrontation; trial not temporarily transferred from courthouse to scene).

Engelhardt cites *State v. Garza*, 26 Kan. App. 2d 426, 431-32, 991 P.2d 905, *rev. denied* 267 Kan. 891 (1999), in general support of his contentions. *Garza* provides no assistance to Engelhardt, however, because that case did not involve a jury view. In *Garza*, the Court of Appeals examined whether the defendant's right to confrontation and due process were violated by his absence from two hearings in the courtroom.

Under the facts of this case, we hold that the jury view did not result in a violation of either K.S.A. 2004 Supp. 22-3405(1) or Engelhardt's federal constitutional rights to confrontation and due process. The parties are correct that the jury view enabled the jury to more fully appreciate the space available in the trailer and the distance between the place of the attack and the witnesses who had been in the bedrooms while the attack was taking place. It also permitted the jury to see the results of the clean-up job described by witnesses. However, the role of the jury view was strictly corroborative. Engelhardt's presence was not "essential to a fair and

just determination of a substantial issue" and thus the jury view did not constitute a critical stage of the proceedings against him.

We are sensitive to the need for us to distinguish this case from our recent opinion in *State v. Calderon*, 270 Kan. 241, 245-46, 13 P.3d 871 (2000). This can be done both factually and legally. In *Calderon*, this court evaluated a defendant's claim that 22-3405(1) and his constitutional right to be present were violated because no interpreter was provided for him during the closing arguments at his trial. Factually, no jury view was in issue; the defendant was physically present, and the jury was in the courtroom. Legally, the issue before the court in *Calderon* was whether a defendant who cannot understand the language in which a proceeding is conducted is "present" in a constitutional sense. Here the issue is whether a particular jury view constituted a critical stage of the criminal proceedings. There was no question in *Calderon* that closing arguments constituted a critical stage, just as there is no question here that Engelhardt was not present at the jury view.

Finally, even if we were to determine there was statutory or constitutional error in excluding Engelhardt from the interior of the trailer during the jury view, that error would not merit reversal. Although *Calderon* indicated that a harmless error inquiry could be inappropriate in certain circumstances when a defendant had been excluded from a trial, see 270 Kan. at 248-53, subsequent cases have limited its structural error approach to its unique facts. See *Mann*, 274 Kan. at 682-84 (harmless error applies; defendant's absence from trial judge's conversation with four jurors did not "implicate a basic consideration of fairness or undermine the function of a criminal trial"); *Lopez*, 271 Kan. at 134 (harmless error rule applies; defendant absent from juror questioning in chambers not "denied a meaningful presence at a critical stage of his trial, nor did his absence . . . implicate the basic consideration of fairness or undermine the function of a criminal trial"). The Court of Appeals applied a harmless error analysis even in a situation far more similar to that before us in *Calderon*. See *State v. Dosal*, No. 89,436, unpublished opinion filed March 26, 2004. In *Dosal*, a defendant who could understand and communicate in English, as his second language, was not supplied with an interpreter during clos-

ing arguments. Because he could understand the proceedings, unlike the defendant in *Calderon,* the basic consideration of fairness was not implicated by the absence of an interpreter, and the court held a structural error analysis would be inappropriate. *Dosal,* Slip op. at 2-3.

In light of the overwhelming evidence against Engelhardt in this case, any theoretical error in excluding him from the jury view would have been harmless under any potentially applicable formula. See *Chapman v. California,* 386 U.S. 18, 21-22, 17 L. Ed. 2d 705, 87 S. Ct. 824 (1967) (if appellate court able to declare beyond a reasonable doubt error had little, if any, likelihood of having charged result of trial, error harmless); *State v. Kendall,* 274 Kan. 1003, 1010, 58 P.3d 660 (2002) (errors not affirmatively causing prejudice to substantial rights of defendant, not preventing substantial justice deemed harmless).

Engelhardt also takes issue with the jury view on the independent grounds that it was cumulative and prejudicial—cumulative because the State also admitted photographs of the trailer into evidence and prejudicial because his absence could have contributed to a jury perception that he was dangerous or a flight risk. Engelhardt cites no legal authority to support these arguments; we have previously rejected the first and see no logic in the second. In *McCorgary,* 218 Kan. at 364, we approved the use of a jury view as well as the admission of photographs of the scene. As for the possibility that Engelhardt's absence may have contributed to a jury perception of him as a flight risk or dangerous, we have no doubt that jurors seeing him inside the trailer in shackles and accompanied by police officers would have been led to a similar, perhaps stronger, perception.

### Prior Bad Acts

Engelhardt argues the district judge erred by allowing the State to introduce evidence of his other crimes or civil wrongs, *i.e.,* prior "bad acts," specifically: (1) his parole status; (2) a photograph of Drake with bruises allegedly inflicted by him; (3) his use of Brian Smith's identification when stopped by police; and (4) his mug shot.

We have stated many times in the past that this court reviews the admission or exclusion of evidence under an abuse of discretion standard. See, *e.g., State v. Jenkins,* 272 Kan. 1366, 1378, 39 P.3d 47 (2002). We have recently clarified this standard of review, reaffirming relevance as the first consideration of the district judge. See *State v. Carter,* 278 Kan. 74, 77, 91 P.3d 1162 (2004); *State v. Shelby,* 277 Kan. 668, 679-80, 89 P.3d 558 (2004) (Nuss, J., concurring); *State v. Meeks,* 277 Kan. 609, 618, 88 P.3d 789 (2004); *State v. Bloom,* 273 Kan. 291, 303, 44 P.3d 305 (2002); K.S.A. 60-407(f). Furthermore, "[o]nce relevance is established, evidentiary rules governing admission and exclusion may be applied either as a matter of law or in the exercise of the district judge's discretion, depending on the contours of the rule in question." *Carter,* 278 Kan. at 77.

The principal rule on admission of evidence of other crimes or bad acts is K.S.A. 60-455. It reads:

"Subject to K.S.A. 60-447, evidence that a person committed a crime or civil wrong on a specified occasion, is inadmissible to prove his or her disposition to commit crime or civil wrong as a basis for an inference that the person committed another crime or civil wrong on another specified occasion but, subject to K.S.A. 60-445 and 60-448, such evidence is admissible when relevant to prove some other material fact including motive, opportunity, intent, preparation, plan, knowledge, identity or absence of mistake or accident."

If evidence is to be admitted under this statute, three requirements must be satisfied. *State v. Boorigie,* 273 Kan. 18, 34, 41 P.3d 764 (2002). First, the evidence must be relevant in proving one of the facts specified in K.S.A. 60-455. Second, the disputed fact must be a material fact. Finally, the probative value of the evidence must outweigh any potential prejudice. As long as these requirements are met, we review the district judge's ruling under an abuse of discretion standard. *State v. Moore,* 274 Kan. 639, 647, 55 P.3d 903 (2002); see also *State v. Wilkerson,* 278 Kan. 147, 153, 91 P.3d 1181 (2004) (when evidence admitted under K.S.A. 60-455, limiting instruction must be given).

We also have permitted evidence of other crimes or bad acts to be admitted independent of K.S.A. 60-455 in certain circumstances. For example, Kansas cases have recognized that " '[a]cts

done or declarations made before, during or after the happening of the principal occurrence may be admissible as part of the res gestae where the acts are so closely connected with it as to form in reality a part of the occurrence. [Citations omitted.]' " *State v. Davis*, 256 Kan. 1, 21, 883 P.2d 735 (1994). Res gestae evidence, although not proving part of the charged crime, has a natural, necessary, or logical connection to the crime. *State v. Gadelkarim*, 256 Kan. 671, 690, 887 P.2d 88 (1994).

Engelhardt argues that none of the evidence about which he complains was admissible under K.S.A. 60-455 and that the district judge failed to consider fully whether the evidence was relevant. Before the district court, Engelhardt filed a motion in limine invoking K.S.A. 60-455 regarding his parole status evidence, but he did not object at trial that any of the other evidence challenged on appeal violated K.S.A. 60-455. It is well established that "[t]he defendant cannot object to the introduction of evidence on one ground at trial and then assert a different ground on appeal." *State v. Synoracki*, 253 Kan. 59, Syl. ¶ 10, 853 P.2d 24 (1993).

As for the State, at trial it made a K.S.A. 60-455 or res gestae evidence argument only with regard to the evidence of Engelhardt's parole status. On appeal the State argues that each piece of evidence was relevant, permitted under K.S.A. 60-455, and part of the res gestae.

We now discuss each piece of challenged evidence in turn.

Evidence Regarding Parole Status

The district court denied Engelhardt's pretrial motion in limine to prevent the jury from hearing testimony regarding statements made at or near the time of the murder about Engelhardt's previous time in prison or his parole status. The court found the statements to be part of the res gestae as well as admissible under K.S.A. 60-455 as relevant to Engelhardt's possible motive, *i.e.*, fear that Michael was a police informant who would report him.

Engelhardt contends that this evidence failed to meet the second requirement under K.S.A. 60-455 because motive was not a substantial issue in this case. In his view, motive is merely a form of identity evidence; and the identity of the killer or killers was not

in question because numerous witnesses testified Brian and Engelhardt were present when Michael was killed.

Engelhardt is mistaken in his assertion that motive evidence is merely a proxy for identity evidence. Although proof of motive can form a part of the State's proof of identity when identity is in question, it also can go far beyond that. Motive supplies the jury with some degree of explanation, responding to a juror's natural tendency to wonder why a defendant behaved in the manner described by the State. Often it is a prominent feature of the State's theory of its case. Motive makes some sense out of what otherwise appear to be completely senseless crimes. See *State v. Tolson*, 274 Kan. 558, 564, 56 P.3d 279 (2002) (motive shown by "longstanding bad blood between an assailant and the victim"); *State v. Jordan*, 250 Kan. 180, Syl. ¶ 8, 825 P.2d 157 (1992) ("Motive is that which incites or stimulates a person to do an action.").

Engelhardt also emphasizes that there were no previous encounters between himself and the victim, Michael. If this is so, he argues, Michael could not have known he was on parole. Further, he asserts, there was no direct testimony showing he was fearful that Michael might report his parole status; thus, the State's theory about his motive could have been no more than "pure supposition," admitted only to inflame the passions of the jury.

Engelhardt overlooks ample testimony indirectly supporting the State's theory that he killed Michael because he was afraid Michael was a snitch who would report him as a parole absconder. Engelhardt had questioned Michael about being a "narc" or a "snitch." Striplin indicated that Engelhardt walked by his bedroom, opened the door, looked in, and said that he knew Striplin and "that was cool and [Striplin therefore] had nothing to worry about." In addition, the evidence demonstrated Engelhardt had been angry with Drake earlier in the evening—indeed, he and Brian discussed the possibility of killing her—because he suspected she was going to call the police.

We are convinced by review of the record that motive, one of the facts enumerated in K.S.A. 60-455, was in issue. Engelhardt's fear of being reported for absconding from parole was a recurring theme in the evidence of the events and conversations leading up

to the murder. There was a logical, even necessary, connection between this evidence and the otherwise sudden attack on the victim. See *Jordan*, 250 Kan. at 191-92 (without prior crimes evidence, jury would have been confused concerning hostility between principal actors). The prejudice from this evidence was not undue; nor did it outweigh its probative value. The district judge had good reason to admit the evidence and did not abuse his discretion in doing so. He gave an appropriate limiting instruction.

Given our holding that K.S.A. 60-455 permitted admission of the parole status evidence, we need not address the district judge's further res gestae justification for his ruling.

Photograph of Drake

During defense counsel's cross-examination of Engelhardt's girlfriend, Drake, she said she felt threatened on the night of the murder by Engelhardt's and Brian's actions. Defense counsel then referred to her preliminary hearing testimony in which she denied that Engelhardt ever threatened her. During the State's redirect, the prosecutor attempted to introduce, over defense counsel's objections, a photograph of Drake taken at the time of her arrest after the murder. The photograph depicted bruises on her face.

After hearing argument outside the presence of the jury, the district judge allowed the State to introduce the photograph because it showed the relationship between the parties and because it was relevant to Drake's testimony that she was fearful, noting she had initially refused to implicate Engelhardt and later changed her mind.

Once the parties were back before the jury, defense counsel again objected to introduction of the photograph, this time based on lack of foundation. Drake then identified herself in the photograph and testified that Engelhardt had hit her in the face with his fist, producing the bruising shown in the photograph.

On re-cross, when defense counsel asked Drake how she got the injuries shown in the photograph, she testified that Engelhardt got angry when she told him about his brother-in-law making a sexual advance toward her. She and Engelhardt argued at the trailer, and Engelhardt hit her because she "was getting loud and the cops

were down the street." This incident happened 3 or 4 days after the murder.

Engelhardt now argues the photograph was not admissible as part of the res gestae because the incident that gave rise to Drake's bruises occurred several days after the murder and had nothing to do with it.

Evidence is relevant if it renders a desired inference more probable than it would be without the evidence or if it has any tendency in reason to prove any material fact. *State v. Sexton,* 256 Kan. 344, Syl. ¶ 1, 886 P.2d 811 (1994). Although the "relationship of the parties" is frequently suggested as a basis independent of K.S.A. 60-455 to admit prior bad acts evidence, Kansas appellate courts have consistently limited it to evidence that establishes the relationship between the defendant and the *victim*—not the relationship between codefendants or between the defendant and a witness. See, *e.g., State v. Lumley,* 266 Kan. 939, 953-54, 976 P.2d 486 (1999); *State v. Carr,* 265 Kan. 608, 624, 963 P.2d 421 (1998); *State v. Jones,* 247 Kan. 537, 547, 802 P.2d 533 (1990); *State v. Crossman,* 229 Kan. 384, 387, 624 P.2d 461 (1981).

We also tend to agree with Engelhardt that the photograph was not admissible to prove part of the res gestae or to explain why Drake may have initially lied to protect Engelhardt. Her testimony on re-cross concerning the circumstances that led to Engelhardt's violence against her demonstrates no connection to the crime or her changeable stories about it.

Regardless, however, we hold that any error in admitting this photograph was harmless. Reversal is required only where an erroneous admission of evidence "is of such a nature as to affect the outcome of the trial and deny substantial justice." *State v. Walker,* 239 Kan. 635, Syl. ¶ 6, 722 P.2d 556 (1986). We are confident the State's overwhelming evidence of Engelhardt's guilt would have led to his conviction, with or without admission of the photograph.

## Use of Brian Smith's Identification

Engelhardt also takes issue with the State's introduction of evidence, over defense counsel's objection, that Engelhardt used

Brian Smith's identification during a traffic stop a few days after the murder. He argues the evidence was irrelevant.

Defense counsel made only general objections to this evidence at trial; there was no objection based on relevance. " '[A] timely and specific objection to the admission of evidence at trial must be made in order to preserve that issue for appeal.' [Citations omitted.]" *State v. Flynn,* 274 Kan. 473, 496, 55 P.3d 324 (2002); see K.S.A. 60-404. A party may not object at trial to the admission of evidence on one ground and then on appeal argue a different objection. *State v. Bryant,* 272 Kan. 1204, 1208, 38 P.3d 661 (2002).

Moreover, even if the evidence of Engelhardt's use of the identification was irrelevant, and an objection was preserved, any erroneous admission was harmless. As stated above, the jury was presented overwhelming evidence of Engelhardt's guilt; the exclusion of the identification evidence would not have changed the result of the trial.

Engelhardt's Mug Shot

Engelhardt also complains about the State's introduction of his mug shot taken at a detention center in Newton after he was arrested on the parole warrant. The district judge overruled defense counsel's relevance objection to the mug shot. The reasons for the mug shot's admission are unclear. However, even if we agree that the mug shot's admission was error, that error was harmless in view of the weight of the evidence.

*Jury Instructions on Aiding and Abetting*

Engelhardt contends that jury Instructions Nos. 14 and 15 on aiding and abetting, given together, contained misstatements of law that rendered them confusing and misleading.

Instruction No. 14 read:

"A person who, either before or during its commission, intentionally aids, abets, counsels or procures another to commit a crime with intent to promote or assist in its commission is criminally responsible for the crime committed regardless of the extent of the defendant's participation, if any, in the actual commission of the crime."

Instruction No. 15 read:

"A person who intentionally aids or abets another to commit a crime is also responsible for any other crime committed in carrying out or attempting to carry out the intended crime, if the other crime was reasonably foreseeable."

Instruction No. 14 conforms to the language of PIK Crim. 3d 54.05 (Responsibility for Crimes of Another), and Instruction No. 15 follows PIK Crim. 3d 54.06 (Responsibility for Crimes of Another—Crime Not Intended). Because defense counsel objected during the jury instructions conference, the following familiar standard of appellate review applies:

" '[The appellate court is] required to consider all the instructions together, read as a whole, and not to isolate any one instruction. If the instructions properly and fairly state the law as applied to the facts of the case, and a jury could not reasonably have been misled by them, the instructions do not constitute reversible error even if they are in some way erroneous.' [Citation omitted.]" *State v. Peterson*, 273 Kan. 217, 221, 42 P.3d 137 (2002).

This court has previously approved each of the challenged instructions individually. See *State v. Manard*, 267 Kan. 20, 34, 978 P.2d 253 (1999) (PIK Crim. 3d 54.05); *State v. Gleason*, 277 Kan. 624, 636-38, 88 P.3d 218 (2004) (PIK Crim 3d 54.06). Engelhardt argues that the district judge's error was in the decision to give the two instructions together.

PIK Crim. 3d 54.05 is congruent with K.S.A. 21-3205(1), which provides that a "person is criminally responsible for a crime committed by another if such person intentionally aids [and] abets . . . the other to commit the crime." The specific intent required to be proved for conviction on a premeditated first-degree murder charge is premeditation. Therefore, under K.S.A. 21-3205(1), a person guilty of aiding and abetting a premeditated first-degree murder must be found, beyond a reasonable doubt, to have had the requisite premeditation to murder the victim.

PIK Crim. 3d 54.06 conforms with K.S.A. 21-3205(2). Under K.S.A. 21-3205(2), a person liable under subsection (1) of the statute is also liable "for any other crime committed in pursuance of the intended crime if reasonably foreseeable by such person as a probable consequence of committing or attempting to commit the

crime intended." Engelhardt argues that the use of PIK Crim. 3d 54.06 was confusing because the instruction did not specify which crime was the allegedly intended crime, *i.e.*, the underlying charge, and which crime was the "other crime" committed in pursuit of the underlying crime. According to Engelhardt, this instruction impermissibly lowered the prosecution's burden of proof for premeditated first-degree murder because the State was not required to prove the specific intent of premeditation.

The district judge gave Instruction No. 15 because he believed it would be possible on the evidence for the jury to conclude Engelhardt was aiding and abetting Brian and yet question whether Brian ever intended to kill the victim during the stabbing. The court noted that, when Brian was questioned by an officer about whether his intention ever changed from merely stabbing Michael to killing him, Brian answered, "No." The court reasoned that the acts committed by Engelhardt and Brian before the infliction of the "death blows" constituted a crime, and, in the context of aiding and abetting the crime, the murder was reasonably foreseeable. In other words, Instruction No. 15 was effectively a felony-murder instruction.

The State argues that, even if Brian initially intended only to inflict serious harm on Michael, *i.e.*, aggravated battery, Engelhardt could have been held liable for Michael's murder as an aider and abettor. The problem with this argument is that the jury was never instructed on aggravated battery. Although an accused is not required to be charged with, prosecuted for, or convicted of an underlying felony in order to be convicted of felony murder, the felony murder itself must be instructed upon. That did not occur here. See *State v. Wise*, 237 Kan. 117, 122-23, 697 P.2d 1295 (1985). Further, if a felony-murder theory had been advanced by the State and instructed upon, it is well established that PIK Crim. 3d 54.05 rather than PIK Crim. 3d 54.06 would have been the appropriate aiding and abetting instruction. *Gleason*, 277 Kan. at 637-38. We therefore hold that the district judge erred by giving Instruction No. 15.

However, we again find the error was harmless. The overwhelming evidence in this case demonstrated that Engelhardt was guilty

of either intentionally murdering the victim or aiding and abetting the intentional murder. The victim was stabbed approximately 55 times, and Engelhardt was clearly involved. He was not an innocent bystander. The jury instructions and the evidence, considered as a whole, did not mislead the jury, even if the instructions were in some way erroneous. See *State v. Mims*, 264 Kan. 506, 514, 956 P.2d 1337 (1998).

### *Lesser Included Crime Instructions*

Engelhardt argues the district judge erred by failing to instruct the jury on unintentional second-degree murder, voluntary manslaughter, and involuntary manslaughter as lesser included offenses of first-degree murder. At trial, Engelhardt objected to instructions on any of these lesser included offenses. Defense counsel also specifically objected unsuccessfully to the intentional second-degree murder instruction given by the district judge, requesting he add language to PIK Crim. 3d 56.03 to inform the jury that intentional second-degree murder does *not* include situations involving mere "heat of passion" or "sudden quarrel."

The district court must instruct the jury as to lesser included crimes where "there is some evidence which would reasonably justify a conviction of some lesser included crime as provided in subsection (2) of K.S.A. 21-3107 and amendments thereto." K.S.A. 2004 Supp. 22-3414(3). Lesser included crime instructions need not be given if the evidence would not permit a rational factfinder to find the defendant guilty beyond a reasonable doubt of the lesser included offenses. *State v. Deavers*, 252 Kan. 149, 151, 843 P.2d 695 (1992), *cert. denied* 508 U.S. 978 (1993); see also *State v. Brice*, 276 Kan. 758, 772-73, 80 P.3d 1113 (2003) (no obligation to instruct on lesser included offenses arises unless offense supported by enough evidence to reach jury). In addition, when a defendant does not object to the giving or failure to give lesser included crime instructions, stating distinctly the matter to which the defendant objects and the grounds of his or her objection, we will find reversible error only if the instructions or failure to give the instructions was clearly erroneous. See K.S.A. 2004 Supp. 22-3414(3); *State v. Kesselring*, 279 Kan. 671, 685-86, 112 P.3d 175, 187 (2005);

*State v. Drennan*, 278 Kan. 704, 712, 101 P.3d 1218 (2004). When there is an absence of evidence to support a lesser included crime instruction, a failure to give it cannot, by definition, be held to be clearly erroneous.

Unintentional second-degree murder is a killing committed recklessly under circumstances manifesting extreme indifference to the value of human life. K.S.A. 2004 Supp. 21-3402(b). Voluntary manslaughter requires a killing to be committed intentionally upon a sudden quarrel or in the heat of passion. K.S.A. 21-3403(a). It is well settled that voluntary manslaughter, like second-degree murder, is a lesser included offense of first-degree murder. *State v. McClanahan*, 254 Kan. 104, 109, 865 P.2d 1021 (1993). Involuntary manslaughter, defined in K.S.A. 2004 Supp. 21-3404(a) to include a killing differing from reckless second-degree murder only in the degree of recklessness required to prove culpability, see *State v. Davidson*, 267 Kan. 667, Syl. ¶ 2, 987 P.2d 335 (1999), also is a lesser included offense of first-degree murder. See *State v. Hebert*, 277 Kan. 61, 105-06, 82 P.3d 470 (2004); *State v. Calderon*, 270 Kan. 241, 255-56, 13 P.3d 871 (2000).

Engelhardt, who clearly adopted an all-or-nothing strategy at trial, now contends that his jury should have had a chance to conclude the murder arose in the heat of passion or during a sudden quarrel, *i.e.,* it amounted to no more than a voluntary manslaughter. In his view, the interrogation and torture of the victim occurred during a "drunken rampage." Engelhardt also points to Brian's inconsistent statements concerning Engelhardt's level of involvement in the murder, asserting the jury could have concluded the attack was an "aggravated battery gone awry."

We view the evidence very differently. The victim's dozens of wounds, inflicted during a period of approximately 20 minutes, negate any claim that the stabbing and killing were unintentional. Further, "heat of passion" involves an "emotional state of mind . . . of such a degree as would cause an ordinary man to act on impulse without reflection." *State v. Guebara*, 236 Kan. 791, 796, 696 P.2d 381 (1985). A "sudden quarrel" involves provocation sufficient to cause an ordinary person to lose control of his or her actions and reason. *Guebara*, 236 Kan. at 796. The fact that a de-

fendant's passion is easily aroused will not be considered in this connection. *State v. Jackson*, 226 Kan. 302, 307, 597 P.2d 255 (1979), *cert. denied* 445 U.S. 952 (1980). Engelhardt fails to persuade us that a fear of getting caught while absconding on parole would cause an ordinary person to act in the way his behavior was described in this case. He further fails to show adequate provocation. There simply was insufficient evidence to support lesser included crime instructions for unintentional second-degree murder, voluntary manslaughter, or involuntary manslaughter. In such a situation, failure to give the lesser included crime instructions cannot amount to clear error.

Moreover, the "skip rule" precludes reversal for the failure to give any of the lesser included crime instructions Engelhardt argues for on appeal. See *State v. Horn*, 278 Kan. 24, 43, 91 P.3d 517 (2004): " 'When a lesser included offense has been the subject of an instruction, and the jury convicts of the greater offense, error resulting from [a] failure to give an instruction on another still lesser included offense is cured. [Citations omitted.]' " (commonly referred to as skip rule). Because the district judge instructed on second-degree intentional murder and the jury convicted Engelhardt on the greater offense of first-degree murder, there can be no reversal for the failure to instruct on the still lesser included offenses of unintentional second-degree murder, voluntary manslaughter, or involuntary manslaughter.

### Witness' Polygraph Examination

Engelhardt also challenges the district judge's decision to exclude the results of Brian Smith's polygraph test.

Our standard of review for this exclusion of evidence has previously been stated. See *State v. Beard*, 273 Kan. 789, 807-08, 46 P.3d 1185 (2002). In regard to polygraph examination results, the Kansas rule is that such results are inadmissible in a criminal proceeding, absent a stipulation by the parties. *State v. Deal*, 271 Kan. 483, 492, 23 P.3d 840 (2001). This rule is attributable in part to the unreliability of polygraph methodology and in part to protection of the jury's role as the factfinder. See *State v. Shively*, 268 Kan. 573, 579-80, 999 P.2d 952 (2000). The parties did not stipu-

late to the introduction of the results of Brian's polygraph test in this case.

Engelhardt contends that his constitutional rights to confrontation and to present a defense required the admission of Brian's polygraph test results as "critical impeachment material." In his original statement to police, Brian took the blame for killing Michael; in a later interview, Brian said Engelhardt had tried to stop him. He then changed his story to say that Engelhardt stabbed Michael in the chest and cut his throat. Apparently, police eventually told Brian that his inconsistent statements meant he would have to take a polygraph examination. However, the polygraph test was not administered until after he had entered into his plea agreement, and the agreement made no provision for it. The examiner determined that Brian was not truthful in his answers when he said that he saw Engelhardt stab Michael in the neck and chest.

Engelhardt cites no Kansas case law to support his legal argument on this claim. He does cite cases from two federal courts that have permitted the defense to cross-examine a witness regarding a failure of a polygraph test or inconclusive answers in response to questions asked during such a test. See *United States v. Lynn*, 856 F.2d 430 (1st Cir. 1988) (abuse of discretion to prohibit defense from cross-examining coconspirator on inconclusive results; exam part of plea agreement); *United States v. Hart*, 344 F. Supp. 522, 523-24 (E.D.N.Y. 1971) (jury allowed to determine how failed polygraph test affected principal witness's credibility).

We decline to adopt the rule of these cases. Polygraph evidence cannot be presented for purposes of corroboration or impeachment. See *Shively*, 268 Kan. at 587-88 (citing *United States v. Piccinonna*, 885 F.2d 1529 [11th Cir. 1989]). We further reject Engelhardt's contention that a defendant's Sixth Amendment right to present witnesses in his or her defense requires admission of the type of polygraph evidence sought to be admitted here. See *Shively*, 268 Kan. at 588 (citing *United States v. Scheffer*, 523 U.S. 303, 315-17, 140 L. Ed. 2d 413, 118, S. Ct. 1261 [1998]). The district judge did not err in adhering to our longstanding prohibition of polygraph evidence absent a stipulation of the parties.

Engelhardt also asserts that the polygraph evidence should have been admitted because of the prosecution's duty to disclose any exculpatory evidence. See *Brady v. Maryland*, 373 U.S. 83, 10 L. Ed. 2d 215, 83 S. Ct. 1194 (1963). Engelhardt and his counsel were well aware of the polygraph results pretrial. There was no actionable failure to disclose here.

*Exclusion of Prior Conviction During Witness Cross-Examination*

Engelhardt next contends the district court erred by prohibiting the defense from impeaching Dorothy Smith by introducing evidence of Brian's prior aggravated battery conviction.

Our standard of review on this evidentiary ruling is the same as previously stated. Generally a district judge has discretion to determine the propriety and scope of cross-examination. *State v. Hutchinson*, 222 Kan. 365, 367, 564 P.2d 545 (1977). However, Engelhardt asserts this issue has constitutional implications, arguing the district court's limitation of his cross-examination of Dorothy denied him his right to present a defense and effectively cross-examine. See *Davis v. Alaska*, 415 U.S. 308, 39 L. Ed. 2d 347, 94 S. Ct. 1105 (1974); *Chambers v. Mississippi*, 410 U.S. 284, 35 L. Ed. 2d 297, 93 S. Ct. 1038 (1973). Constitutional claims raise issues of law subject to de novo appellate review. *State v. Rivera*, 277 Kan. 109, 113, 83 P.3d 169 (2004).

During the State's direct examination of Dorothy regarding her relationship with her husband Brian, she testified that there had been "stress and tension between" them and Engelhardt. Over defense counsel's objection, the district court allowed the prosecutor to question Dorothy about the reason for the tension relevant to the issue of "control." Dorothy testified that Brian was an alcoholic and that Engelhardt would bring him alcohol, get Brian "very, very drunk," and try to turn Brian against her. Dorothy further testified that Engelhardt did not like her to be around because then he could not manipulate Brian all the time. The court sustained defense counsel's objection to this particular statement as "speculative."

On cross-examination, defense counsel asked Dorothy whether Brian "gets violent when he drinks." She admitted that Brian was

an alcoholic but "wouldn't say [he was] violent." When questioned further, Dorothy admitted Brian had "broken a few dishes here and there." When asked whether Brian had broken windows out of cars, Dorothy answered, "What I was told was that that [sic] wasn't him. I did not directly witness that." She further testified she could not remember whether Brian had threatened to kill her and Drake, but she admitted she must have said as much if an investigator's report said she did. Outside the presence of the jury, defense counsel then requested permission to introduce evidence of Brian's prior violent conduct, such as "aggravated battery," as part of this cross-examination. The defense argued that the State had attempted, through Dorothy's testimony, to portray Brian "as a decent guy unless [Engelhardt was] there feeding him alcohol, getting him drunk." Defense counsel wanted to prove Brian was capable of committing violent acts without the influence of Engelhardt. The district judge denied defense counsel's request to introduce evidence of Brian's prior violent conduct, finding the State did not open the door to such evidence.

Engelhardt cites the following two cases to support his contention that evidence of Brian's prior violent conduct should have been admitted to discredit Dorothy generally and to specifically undercut her testimony regarding Brian's good character.

In *State v. Mays*, 254 Kan. 479, 866 P.2d 1037 (1994), the victim claimed that Mays raped and robbed her. Mays did not deny the victim was raped. Instead, he claimed the victim named him as the offender at the urging of her boyfriend because of a feud over money belonging to the boyfriend that Mays had lost gambling. The excluded evidence in *Mays* included testimony about the victim's financial dependence on her boyfriend and her boyfriend's threat to "get even" with the defendant. See 254 Kan. at 482-86. This court concluded the "exclusion of relevant, admissible, noncumulative evidence bearing upon the credibility of a critical prosecution witness unfairly prejudiced the defendant" and violated Mays' right to a fair trial. 254 Kan. at 487.

In *State v. Davis*, 237 Kan. 155, 160, 697 P.2d 1321 (1985), during redirect examination of accomplice Donald Coty, defense counsel elicited comments from the witness that " '[robbing] ain't

my lifestyle.' " Coty further stated that he had never robbed people. Following his testimony, the defense sought to present testimony from Coty's mother that Coty made a living committing robbery. This court noted that K.S.A. 60-420 permitted any party, even the party calling a witness, to introduce extrinsic evidence "concerning any conduct by [the witness] or any other matter relevant" for the purpose of attacking the witness' credibility. However, evidence of traits of a witness' character "other than honesty or veracity or their opposites, as well as evidence of specific instances of conduct relevant only to prove such traits of character, are inadmissible as affecting credibility." 237 Kan. at 160 (citing K.S.A. 60-422[c], [d]; *State v. Nixon*, 223 Kan. 788, 576 P.2d 691 [1978]). The *Davis* court concluded that the exclusion of the evidence attacking Coty's credibility was prejudicial to the defendant. 237 Kan. at 160-61.

*Davis* and *Mays* are distinguishable from the present case. Unlike the situation in *Davis*, one reason the defense wanted to introduce evidence of Brian's prior aggravated battery conviction in this case was to show that Dorothy knew of this prior bad conduct and was concealing it. This would have been an improper use of such evidence. See *Davis*, 237 Kan. at 160.

*Mays* is distinguishable because Dorothy was not a "critical" prosecution witness. This was not a he said-she said rape case. Numerous other witnesses testified to the events leading up to the murder and the activities to avoid detection after it occurred. Even if Dorothy's credibility had been destroyed, Engelhardt faced other highly effective and incriminating accusers.

We see no abuse of discretion and no violation of the defendant's constitutional rights in the district judge's ruling on the scope of Dorothy's cross-examination.

### Cumulative Error

Engelhardt argues that the cumulative effect of multiple trial errors denied him a fair trial.

" 'Cumulative trial errors, when considered collectively, may be so great as to require reversal of the defendant's conviction. The test is whether the totality of circumstances substantially prejudiced the defendant and denied the defendant a

fair trial. No prejudicial error may be found upon this cumulative effect rule, however, if the evidence is overwhelming against the defendant.' [Citation omitted.]" *State v. Plaskett*, 271 Kan. 995, 1022, 27 P.3d 890 (2001).

As we previously observed, the evidence against Engelhardt was overwhelming. There was no cumulative error meriting reversal.

## *Motion for New Trial*

Engelhardt further argues the district court erred by denying his motion for a new trial based on newly discovered evidence under K.S.A. 22-3501(1).

This court reviews the denial of a motion for a new trial based on newly discovered evidence for abuse of discretion. Judicial discretion is abused when no reasonable person would adopt the view taken by the district judge. See *State v. Moncla*, 273 Kan. 856, 861, 46 P.3d 1162 (2002). A new trial is warranted only if the defendant establishes that the new evidence could not have been produced at trial with the exercise of reasonable diligence and there is a reasonable probability the new evidence would produce a different result upon retrial. *State v. Norton*, 277 Kan. 432, Syl. ¶ 2, 85 P.3d 686 (2004).

Engelhardt argues he should have been granted a new trial because, after his conviction, Brian Smith told fellow inmate Gerald Gray at the Harvey County Jail that Engelhardt was "pissed because I put my case off on him." Gray allegedly heard Brian say twice that he "put [his] case off on [Engelhardt]." This information was submitted to the district court by way of an affidavit of defense investigator Sue Neeley.

Regarding the question of whether this evidence could have been produced at trial with the exercise of reasonable diligence, we note it is not entirely clear when the alleged statements were made. The record shows that Engelhardt was convicted in November 2002, and these statements allegedly occurred after Gray was placed in jail in October 2002. Without more information, we cannot be certain that the statements were made after Engelhardt's conviction.

Even if this hurdle could be overcome, we are skeptical that this evidence would produce a different result if the case were retried.

Contrary to Engelhardt's contention, the State's evidence did not rest primarily on Brian's testimony. As discussed above, multiple witnesses offered testimony implicating Engelhardt in the murder. Moreover, Brian was not called as a witness for the State; he was called by the defense for cross-examination regarding his statements introduced through other witnesses during the State's case. Moreover, Brian was thoroughly cross-examined on his shifting version of events; his credibility was unquestionably attacked.

We hold the district judge did not abuse his discretion by denying Engelhardt's motion for a new trial based on newly discovered evidence. The introduction into evidence of Brian's statements to Gray would not produce a different result upon retrial.

### Constitutionality of Hard 50 Sentence

Engelhardt contends that Kansas' hard 50 sentencing formula is unconstitutional because it does not afford criminal defendants the right to have a jury determine beyond a reasonable doubt all the facts which might increase the maximum penalty for first-degree murder.

The constitutionality of a statute is a question of law over which this court has unlimited review. *State v. Beard,* 274 Kan. 181, Syl. ¶ 1, 49 P.3d 492 (2002).

Engelhardt asks this court to revisit *State v. Conley,* 270 Kan. 18, 11 P.3d 1147 (2000), *cert. denied* 532 U.S. 932 (2001), where we upheld a hard 40 sentence as constitutional. See also *Harris v. United States,* 536 U.S. 545, 567, 153 L. Ed. 2d 524, 122 S. Ct. 2406 (2002) ("Within the range authorized by the jury's verdict, however, the political system may channel judicial discretion—and rely upon judicial expertise—by requiring defendants to serve minimum terms after judges make certain factual findings.").

Engelhardt relies on several recent United States Supreme Court cases. See *Ring v. Arizona,* 536 U.S. 584, 589, 153 L. Ed. 2d 556, 122 S. Ct. 2428 (2002); *Apprendi v. New Jersey,* 530 U.S. 466, 494, 147 L. Ed. 2d 435, 120 S. Ct. 2348 (2000); *Jones v. United States,* 526 U.S. 227, 243, 143 L. Ed. 2d 311, 119 S. Ct. 1215 (1999).

This court has previously considered these cases and nevertheless upheld the hard 50 sentencing scheme and *Conley*. See, *e.g.*, *State v. Hurt*, 278 Kan. 676, 686-88, 101 P.3d 1249 (2004); *State v. Wilkerson*, 278 Kan. 147, 160, 91 P.3d 1181 (2004); *State v. Hebert*, 277 Kan. 61, 108, 82 P.3d 470 (2004); *State v. Boldridge*, 274 Kan. 795, 812, 57 P.3d 8 (2002), *cert. denied* 538 U.S. 950 (2003). This challenge to Engelhardt's sentence fails.

### Sufficiency of Evidence to Support Hard 50 Sentence

The district court imposed the hard 50 sentence after finding: (1) Engelhardt was previously convicted of a felony in which he inflicted great bodily harm, K.S.A. 2004 Supp. 21-4636(a); and (2) the murder was committed in an "especially heinous, atrocious, or cruel manner," K.S.A. 2004 Supp. 21-4636(f).

Engelhardt challenges the sufficiency of the evidence to support the second aggravator. He also contends mitigating factors outweighed the aggravating factors.

K.S.A. 2004 Supp. 21-4636 sets forth circumstances that can lead to a finding a defendant committed a crime in an especially heinous, atrocious, or cruel manner:

"(f) . . . A finding that the victim was aware of such victim's fate or had conscious pain and suffering as a result of the physical trauma that resulted in the victim's death is not necessary to find that the manner in which the defendant killed the victim was especially heinous, atrocious or cruel. In making a determination that the crime was committed in an especially heinous, atrocious or cruel manner, any of the following conduct by the defendant may be considered sufficient:

. . . .

(3) infliction of mental anguish or physical abuse before the victim's death; [and]
(4) torture of the victim."

Our standard of review is whether, after review of the evidence, viewed in the light most favorable to the prosecution, a rational factfinder could have found the existence of the aggravating circumstance by a preponderance of the evidence. *State v. Robertson*, 279 Kan. 291, 307, 109 P.3d 1174 (2005).

When the evidence in this case is viewed in the light most favorable to the prosecution, it supports the district judge's finding that Michael's murder was committed in an especially heinous,

atrocious, or cruel manner. Engelhardt and Brian stood over Michael and stabbed him approximately 55 times. The attack lasted about 20 minutes, and several witnesses heard Michael's anguished screams. Engelhardt bragged to his friends about hearing a hissing sound when he stabbed Michael in the chest and said callously that it seemed each of Michael's final heartbeats caused more blood to "just squirt out." The coroner testified that there was evidence of two defensive injuries to Michael's right arm and possible defense wounds on his right shoulder. These facts demonstrate the existence of the aggravating factors set forth in K.S.A. 2004 Supp. 21-4636(f)(3) and (4).

Our standard of review on the district court's weighing of aggravating and mitigating circumstances is abuse of discretion. See *Boldridge,* 274 Kan. at 809. "Weighing aggravating and mitigating circumstances is not a numbers game. 'One aggravating circumstance can be so compelling as to outweigh several mitigating circumstances'" or vice versa. *State v. Bedford,* 269 Kan. 315, 331-32, 7 P.3d 224 (2000) (quoting *State v. Phillips,* 252 Kan. 937, Syl. ¶ 3, 850 P.2d 877 [1993]). Judicial discretion is abused when no reasonable person would take the view adopted by the district judge. *State v. Beard,* 273 Kan. 789, 807-08, 46 P.3d 1185 (2002).

The sentencing hearing record reveals the district judge explicitly considered the support of Engelhardt's family, the "weak sentence" of 22 years given to Brian, Engelhardt's intoxication at the time of the murder, and the length of sentence Engelhardt would serve even without the imposition of a hard 50 sentence. Without the imposition of a hard 50, Engelhardt still would not have been eligible for parole for 25 years.

Although the district judge was troubled by Brian's lower sentence, his ultimate conclusion that it would be unfair to "undersentence" Engelhardt for his role in the murder was reasonable. Given the grisly facts of this case, we see no abuse of discretion in the conclusion that the aggravating circumstances—particularly that the crime was committed in an especially heinous, atrocious, or cruel manner—outweighed any mitigating factors.

We are similarly unpersuaded by Engelhardt's complaint that the district judge failed to consider whether he was an accomplice to the murder. See K.S.A. 21-4637(d). The record shows the district court considered this contention and rejected it. There also was no abuse of discretion in this respect.

Affirmed.

LOCKETT, J., Retired, assigned.