FILED
United States Court of Appeals
Tenth Circuit

September 16, 2014

Elisabeth A. Shumaker
Clerk of Court

UNITED STATES COURT OF APPEALS

TENTH CIRCUIT

ROBERT J. ENGELHARDT,

Petitioner - Appellant,

v.

JAMES HEIMGARTNER, Warden, El
Dorado Correctional Facility;
ATTORNEY GENERAL OF KANSAS,

Respondents - Appellees.

No. 14-3040
(D. Kansas)
(D.C. No. 5:11-CV-03179-SAC)

ORDER DENYING CERTIFICATE OF APPEALABILITY

Before **HARTZ**, **McKAY**, and **MATHESON**, Circuit Judges.

Robert Engelhardt, a Kansas state prisoner, filed a pro se application for relief

under 28 U.S.C. § 2254 in the United States District Court for the District of Kansas.

The district court denied his application. He now seeks a certificate of appealability

(COA) from this court to pursue an appeal. *See* 28 U.S.C. § 2253(c)(1)(A) (requiring a

COA to appeal denial of § 2254 application). He claims entitlement to relief on the

grounds (1) that he was prejudiced by an erroneous aiding-and-abetting instruction; (2)

that he received ineffective assistance of trial counsel because his lawyer did not

introduce evidence that would have corroborated his defense; (3) that the trial court

improperly imposed a mandatory minimum sentence of 50 years' imprisonment after finding the predicate facts by a preponderance of the evidence, contrary to the constitutional requirement that the facts be found by a jury beyond a reasonable doubt; (4) that the prosecutor engaged in misconduct by intentionally using false testimony from two detectives; and (5) that the cumulative effect of errors at his trial was not harmless. We deny his request for a COA.

## I.  BACKGROUND

Mr. Engelhardt was convicted of first-degree murder and sentenced to life imprisonment with a mandatory minimum of 50 years' imprisonment. The Kansas Supreme Court affirmed his conviction. *State v. Engelhardt*, 119 P.3d 1148, 1155–57 (Kan. 2005). In its decision it summarized the evidence as follows:

> Engelhardt was on parole but had not reported to his parole officer as directed. He lived in Wichita with his girlfriend, Michelle Drake, and his friends, Brian and Dorothy Smith. One evening Drake tried to telephone her mother, but Engelhardt became concerned that she was going to call the police and turn him in. Both couples began screaming. Drake described Engelhardt as "irate." Eventually they all left the house in Brian's car, with Engelhardt driving. At some point, Engelhardt stopped the car by the side of the road, and he and Brian got out to talk at the back of the car, discussing whether to kill the two women.
> The group traveled to the trailer home of Engelhardt's cousin, Kevin Eveland, and Kevin's wife, Christina, in Newton, Kansas. Christina awoke to yelling outside the trailer. When she tried to wake Kevin, Engelhardt came in and told her and Kevin to get up and go into the living room. Michael Smith, an acquaintance of Kevin's, had come over to stay for a couple of days and was lying on the couch in the living room. Apparently, Kevin told Engelhardt that Michael had been in prison before. Michael awoke when Engelhardt and Brian started yelling at him, leaning over him, and asking him questions. Engelhardt, in a loud and threatening tone, asked Michael who he was, why he was there, if he had ever "done jail

2

time," and if he was a "narc" who had been planted there by the cops. Michael was unable to answer the questions to the satisfaction of Engelhardt and Brian, who were both drunk and "out of control." At one point, Engelhardt made Michael lift up his shirt and pull down his pants so that Engelhardt could look for a recording device.

Engelhardt then went to the kitchen, came back into the living room, and demanded that Dorothy, Drake, Christina, and Kevin go to the trailer's back bedroom. The four of them did so, and Engelhardt and Brian stayed in the living room with Michael.

More yelling then emanated from the living room. Christina, who was pregnant, lay down on the bed in the back bedroom and held her hands over her ears. Kevin and Drake also had their hands over Christina's ears, and Kevin placed a pillow over her head because of Michael's screaming. Michael, sounding terrified, repeatedly said, "No." When asked later why she did not call the police, Christina testified that Engelhardt had directed them to unplug the phone when he first arrived. Engelhardt had said that "they were fighting," and he did not want the police to be called.

James Striplin also lived in the trailer. He was asleep in another bedroom and woke up when Engelhardt and the others arrived. From his room, Striplin heard arguing, crying, and yelling. He later testified that he heard a discussion with Michael about prison and a cemetery around a prison. He also heard Michael say, "No, no, no." Striplin stayed in his room because he thought Michael was being smacked around and "it wasn't [his] place" to get involved. When the screaming stopped it "just went quiet," and Striplin fell asleep.

During the attack on Michael and its immediate aftermath, Drake emerged from the back bedroom three times. The first time she walked down the hall toward the living room, looked in, and walked back to the bedroom. At that time, Engelhardt and Brian were hovering over Michael, and Michael was screaming; both Engelhardt and Brian were attacking Michael, but she could not see much because of the angle of the couch. When Drake came out a second time, Engelhardt took her back to the bedroom and told her to stay there. The third time Drake left the bedroom, the screaming had stopped. She walked out to the kitchen and saw Engelhardt and Brian standing there, both covered with blood. Engelhardt held a large bloody butcher knife in his hand. Drake walked over to Michael and found him dead; there was blood everywhere, and Michael was, using her word, "demolished." The entire event lasted 20 or 30 minutes.

Drake helped Engelhardt and Brian put Michael's body on a shower curtain and into the back seat of Michael's car. Engelhardt drove Michael's

3

car into the country, and Drake and Brian followed in Brian's car. Engelhardt and Brian dropped Michael's body into a ditch. The two men then drove Michael's car (and Drake followed) to another location and left it. They returned with Drake to the trailer.

Christina later testified that, after the trailer got quiet, Engelhardt had come back to the bedroom and told her, Kevin, and Dorothy in a threatening tone to stay there until he returned. Engelhardt had blood on his clothes and his hands. Drake then left with him. When they returned, according to Christina, Engelhardt was covered "from head to toe" with blood. Engelhardt said Michael was there to "narc," so he "took care of the problem." Dorothy testified that Engelhardt said he had killed Michael.

Engelhardt told the others to clean up the trailer. In the living room there was blood on the walls, on the ceiling, in two puddles on the floor by the couch, and all over the couch. They dismantled the couch, tore out the carpet, and put everything that had blood on it into the back of Kevin's truck. Engelhardt and Striplin took the items in the truck and burned them.

Kevin went with Engelhardt to Wichita to get paint and carpet from the home of Paul Dickerson, Drake's former boyfriend. Kevin overheard Engelhardt tell Dickerson, "We just killed somebody." Dickerson later testified that Engelhardt said, "I killed somebody." Back at the trailer, Engelhardt told the others to tell police that the couch was gone because Striplin had fallen asleep on it with a cigarette and the couch had "burned up."

Michael's decomposing body was found 6 days after he was killed. He had been stabbed approximately 55 times in the head and chest. Michael's car also was found nearby, its keys still in the ignition. When evidence led police to the trailer, Kevin initially told them that Michael had left to get some food and never returned. When asked about the missing couch, Kevin and Christina said Striplin had fallen asleep with a burning cigarette and set the couch on fire, as Engelhardt had instructed them. However, after arson investigators started examining the scene, Kevin approached one of the detectives and said, "They killed a man on my couch, they stabbed him and we've been forced to help."

In Drake's original statements to police, she placed the blame for the killing on Brian. This was the story she, Engelhardt, Dorothy, and Brian had discussed and agreed upon. Engelhardt had told Drake she would go to jail for 40 years because she was an accessory; after the State granted her immunity, she agreed to testify against Engelhardt. According to Drake's testimony, Engelhardt told her he sliced Michael's throat and stabbed him in the heart to "put him out of his misery."

4

Brian testified against Engelhardt pursuant to a plea agreement in which Brian agreed to plead guilty to second-degree unintentional murder. Brian told police that he and Engelhardt had come up with a plan for Brian to take most of the blame for the killing; if witnesses became a problem, Engelhardt was to kill them. Brian said he had agreed to the plan to protect Dorothy and admitted to police that he "just goes off on people" when drunk. Brian further admitted that he and Engelhardt had been drinking on the night of the murder and said that they tended to "feed" off each other during altercations.

Brian had three different interviews with police. In all three he admitted that he was the first to stab Michael. And initially, as planned, he took the blame for the murder. By the time of the second interview, Brian said everything in his first statement was true except that he had left out that Engelhardt helped him "'do this dude.'" At some point, Brian also told police that Engelhardt was trying to lay the whole blame on him and that Brian did not understand why.

According to Brian, Engelhardt told Michael to answer his questions or Brian would kill him. During one police interview, Brian admitted to being the first to take a paring knife from a kitchen drawer. Then Engelhardt got a second paring knife and a butcher knife from the kitchen. In another version of Brian's story, Brian obtained the butcher knife from the kitchen. As Brian was stabbing Michael, Engelhardt told Brian to "cut him deeper." In yet another version of Brian's story, Brian said Engelhardt tried to pull him off of Michael and make him stop. Brian also said that, after he and Engelhardt had inflicted multiple wounds but Michael was still talking, Engelhardt said, "We have to kill him, we'll go to jail for what we've done." Brian said that was when Engelhardt cut Michael's throat and stabbed him in the chest.

Police discovered blood on Striplin's socks and shoes, and he eventually led police to the location where he and Engelhardt had burned the bloody items from the house. Officers also found seven knives at the burn site, including paring knives and a larger knife. They found another knife in a bag of trash near the trailer.

*Id.* at 1155–57. Summing up in the light most favorable to the prosecution, the court

wrote:

Engelhardt and Brian stood over Michael and stabbed him approximately 55 times. The attack lasted about 20 minutes, and several witnesses heard Michael's anguished screams. Engelhardt bragged to his friends about

5

hearing a hissing sound when he stabbed Michael in the chest and said callously that it seemed each of Michael's final heartbeats caused more blood to "just squirt out." The coroner testified that there was evidence of two defensive injuries to Michael's right arm and possible defense wounds on his right shoulder.

*Id.* at 1170.

Defendant unsuccessfully sought postconviction relief from the trial court. The Kansas Court of Appeals summarily affirmed, *see Engelhardt v. State*, 246 P.3d 413, \*1 (Kan. Ct. App. 2011) (unpublished table decision), and the state supreme court denied review. Defendant then filed his § 2254 application, which was denied.

## II. DISCUSSION

### A. Standard of Review

A COA will issue "only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). This standard requires "a demonstration that . . . includes showing that reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were adequate to deserve encouragement to proceed further." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000) (internal quotation marks omitted). In other words, the applicant must show that the district court's resolution of the constitutional claim was either "debatable or wrong." *Id*.

The Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), provides that when a claim has been adjudicated on the merits in a state court, a federal court can grant habeas relief only if the applicant establishes that the state-court decision was

6

"contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(1), (2). As we have explained:

> Under the "contrary to" clause, we grant relief only if the state court arrives at a conclusion opposite to that reached by the Supreme Court on a question of law or if the state court decides a case differently than the Court has on a set of materially indistinguishable facts.

*Gipson v. Jordan*, 376 F.3d 1193, 1196 (10th Cir. 2004) (brackets and internal quotation marks omitted). Relief is provided under the "unreasonable application" clause "only if the state court identifies the correct governing legal principle from the Supreme Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id.* (brackets and internal quotation marks omitted). Thus, a federal court may not issue a habeas writ simply because it concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. *See id.* Rather, that application must have been unreasonable. For those of Mr. Engelhardt's claims which the Kansas Supreme Court adjudicated on the merits, "AEDPA's deferential treatment of state court decisions must be incorporated into our consideration of [his] request for [a] COA." *Dockins v. Hines*, 374 F.3d 935, 938 (10th Cir. 2004).

**B.    Aiding-and-Abetting Instruction**

Instruction 14 at Defendant's trial said:

7

> A person who, either before or during its commission, intentionally aids, abets, counsels or procures another to commit a crime with intent to promote or assist in its commission is criminally responsible for the crime committed regardless of the extent of the defendant's participation, if any, in the actual commission of the crime.

*Engelhardt*, 119 P.3d at 1163 (internal quotation marks omitted). The Kansas Supreme Court held that it was error to also give Instruction 15, which said that "[a] person who intentionally aids or abets another to commit a crime is also responsible for any other crime committed in carrying out or attempting to carry out the intended crime, if the other crime was reasonably foreseeable," *id.* (internal quotation marks omitted), because it amounted to a felony-murder instruction without identifying or instructing on the underlying felony, *see id.* at 1164. But the court concluded that the error was harmless, explaining:

> The overwhelming evidence in this case demonstrated that Engelhardt was guilty of either intentionally murdering the victim or aiding and abetting the intentional murder. The victim was stabbed approximately 55 times, and Engelhardt was clearly involved. He was not an innocent bystander. The jury instructions and the evidence, considered as a whole, did not mislead the jury, even if the instructions were in some way erroneous.

*Id.* at 1164–65.

Defendant argues that the error was not harmless because it "likely misl[ed] the jury," "lowered the State's burden," and was "likely to be prejudicial." Aplt. Br. at 3.11. But on habeas review the federal court must hold that an error was harmless "unless it had substantial and injurious effect or influence in determining the jury's verdict." *Dodd v. Trammell*, 753 F.3d 971, 997 (10th Cir. 2013). Here, the district court applied the

8

correct standard and held that the instructional error was harmless. No reasonable jurist could debate the correctness of that holding.

### C. Ineffective Assistance of Trial Counsel

Defendant's claim of ineffective assistance of trial counsel concerns impeachment of Smith. Smith did not testify in the prosecution's case in chief. But to begin the defense case, Defendant's attorney offered into evidence a videotape of a statement made by Smith to police after he had turned himself in. On that occasion Smith took responsibility for the murder, without implicating Defendant. The prosecution then offered into evidence two later statements by Smith. Both had been recorded, but the evidence came in through the testimony of the officer who had taken the statements. One statement was made by Smith less than two hours after the statement shown in the videotape. In that statement he said that after he had repeatedly stabbed the victim with a paring knife, Defendant said that the victim had to die and then used a butcher knife to cut the victim's throat and stab him in the chest. The other statement offered by the prosecution was a more detailed statement of Defendant's involvement made after Smith had reached an agreement with the prosecution to plead guilty to a lesser offense. After this testimony came in, the defense called Smith as a witness for cross-examination. The questioning elicited his very favorable plea bargain and his having paid a fellow prisoner to forge a letter purportedly written by Defendant threatening Smith's wife to prevent her from testifying. The prosecution then elicited Smith's testimony that he had told the truth in his statement after reaching the plea agreement.

9

The claim of trial-counsel ineffectiveness is based on counsel's failure to offer into evidence two letters written by Smith to Defendant. The rambling letters contained statements indicating that Smith committed the murder and Defendant did not. Among other things, the letters said, "I'm sorry I lied," R. at 124, "I told them you tried to pull me off," *id.* at 121, "I didn't see you do anything," *id.*, "I already told them I did everything, but they say they have prints, DNA, etc. Whatever," *id.*, and "[I] came in today to turn myself in. Now trying to convince these fags you didn't do shit," *id.* at 122.

Defendant raised this claim in his state postconviction proceeding. At an evidentiary hearing, Smith testified about the contents of the letters. He said that he wrote the letters to "stay on [Defendant's] good side," Supp. R. (Tr. of Proceedings Vol. III at 13–14, *Engelhardt v. State*, No. 06 CV 208 (9th Jud. Dist., Harvey Cnty, Kan., Apr. 22, 2009)); that the first letter was "offering . . . to say anything to help [Defendant] out," *id.* at 14; and that when the second letter said, "I'm sorry I lied," he meant, "I'm sorry I lied to you previously that I would take the hit for you," *id.* at 16.

The trial court ruled that defense counsel's failure to offer the letters at trial was deficient performance. It refused relief, however, because the deficiency did not prejudice Defendant. It wrote:

> The jury clearly should have been made aware of [the letters], but the failure to present them to the jury does not, in my mind, create the possibility that their verdict would have been different. They are merely more evidence of the muddled, inconsistent and shifting positions taken by Brian Smith throughout the case. The letters themselves are neither clearly inculpatory nor exculpatory and in places are borderline incoherent. I find myself concluding, as did the [state] Supreme Court, that the State's case

10

did not primarily rely upon the testimony of Brian Smith. Because there was so much other compelling evidence in the case apart from Smith's testimony, I do not believe adding the two additional letters of Brian Smith would have been likely to change the outcome of the trial.

*Id.*, Vol. I at 96 (Decision of the Court, *Engelhardt*, No. 06 CV 208 (Jan 28, 2009)).

To prevail on a claim of ineffective assistance of counsel, Defendant must show that his counsel's performance was deficient and that the deficiency caused prejudice. *See Strickland v. Washington*, 466 U.S. 668, 687 (1984). To show prejudice, a "defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694. Under AEDPA we review whether it was unreasonable for the state court to determine that the prejudice prong of *Strickland* was not satisfied. *See Harrington v. Richter*, 131 St. Ct. 770, 791 (2011). Further, "in assessing prejudice a reviewing court must consider all the relevant evidence that the jury would have had before it if [Defendant] had pursued the different path [offering the two letters]—not just the mitigation evidence [Defendant] could have presented, but also the [testimony of Smith] that almost certainly would have come in with it." *Wilson v. Trammell*, 706 F.3d 1286, 1306 (10th Cir. 2013) (alterations and internal quotation marks omitted).

Defendant argues that the state court "unreasonably applied *Strickland* in analyzing the prejudice prong." Aplt. Br. at 3.2**.** We disagree. The letters would have only impeached the prosecutor's impeachment of a defense witness. Smith's statements

were not an important part of the prosecution's case, because the details of what was done by Smith and what was done by Defendant were not material to guilt. The other evidence strongly implied that the two men were responsible for the victim's death. Although there were certainly reasons to question the veracity of the other prosecution witnesses, the letters were irrelevant to their credibility; none of them testified to the roles of the two men in the stabbing. In light of AEDPA deference, no reasonable jurist could debate the district court's rejection of this claim.

## D. Constitutionality of Sentence

Defendant contends that his "hard 50" sentence was unconstitutional because the factual predicate for the mandatory minimum was found by the trial judge by a preponderance of the evidence, rather than being found by a jury beyond a reasonable doubt. He acknowledges that he cannot rely on *Alleyne v. United States*, 133 S. Ct. 2151 (2013), because this court has ruled that *Alleyne* does not apply retroactively on collateral view. *See In re Payne*, 733 F.3d 1027, 1029 (10th Cir. 2013). But he argues that his sentencing to the mandatory minimum violated *Apprendi v. New Jersey*, 530 U.S. 466 (2000). The state court, however, did not unreasonably apply *Apprendi* in affirming his sentence. At the time of Defendant's sentence and appeal, Supreme Court precedent was that *Apprendi* did not apply to mandatory minimums. *See Harris v. United States*, 536 U.S. 545, 557 (2002), *overruled by Alleyne*. No reasonable jurist could debate the district court's rejection of Defendant's challenge to his sentence.

### E. Prosecutorial Misconduct

Defendant argues that the prosecution engaged in "misconduct by using false testimony from two detectives during trial and again at closing." Aplt. Br. at 3.18. But the errors in their testimony that Defendant relies on were corrected shortly thereafter by the witnesses on questioning by defense counsel. Defendant points out that the prosecutor in closing argument repeated several times the erroneous original version of one of the detectives, but defense counsel alerted the jury to the repeated error by voicing an objection, and the trial court reminded the jurors to rely on their own memories of the evidence.

The district court noted that the testimonial errors were "minor discrepancies and variances in phrasing that naturally occur in the absence of perjury," and concluded that Defendant "has not shown any prosecutorial misconduct, let alone conduct sufficient to violate his due process rights." R. at 311 (Memorandum & Order at 32, *Engelhardt v. Heimgartner*, No. 11-3179-SAC (D. Kansas Jan. 31, 2014)). No reasonable jurist could debate the ruling that the errors did not deprive Defendant of due process.

### F. Cumulative Error

Defendant argues that he is entitled to habeas relief because of cumulative error. "The cumulative effect of the errors will be deemed harmful if they so infected the trial with unfairness as to make the resulting conviction a denial of due process," *Lockett v. Trammel*, 711 F.3d 1218, 1245 (10th Cir. 2013) (internal quotation marks omitted), *cert.*

13

*denied,* 134 S. Ct. 924 (2014).  No reasonable jurist could debate the district court's ruling that this standard was not met.

**III.    CONCLUSION**

We DENY Defendant's request for a COA and DISMISS the appeal.

ENTERED FOR THE COURT


Harris L Hartz
Circuit Judge

14